ALABAMA & VICKSBURG RAILWAY COMPANY *v.* PEARL MORRIS.

[60 South. 11.]

1. RAILROADS. *Transportation of passengers. Separation of Passengers. Code 1906, section 1351-4059. Civil rights. Damages. Excessiveness.*

    Sections 1351 and 4059, Code 1906, were intended to apply to sleeping cars as well as to all other cars composing the trains of common carriers doing business in this state. It was the purpose of the legislature to separate the races and also to provide for the fair and equal treatment of the members of each race.

2. SAME.

    This statute applies to interstate travelers aboard trains forming a part of a chain of carriers engaged in the business of transporting passengers taken within the state for carriage to a point without the state, and so construed is not invalid, as an interference with interstate commerce, but is a reasonable exercise of the police powers of the state.

3. CIVIL RIGHTS. *Separate accommodations. Damages. Excessiveness.*

    In a suit for damages by a white passenger against a railroad company for assigning her to a sleeping car in which negroes were being carried a judgment for fifteen thousand dollars was excessive and would be reversed unless all but two thousand dollars was remitted.

APPEAL from the circuit court of Warren county. HON. H. C. MOUNGER, Judge.

Suit by Pearl Morris against the Alabama & Vicksburg Railway Company. From a judgment for plaintiff, defendant appeals.

. The sections of the Code of 1906 under review are as follows:

"4059. Every railroad carrying passengers in this state shall provide equal but separate accommodations for the white and colored races by providing two or more passenger cars for each passenger train, or by dividing the passenger cars by a partition to secure separate accommodations; and the conductor of such passenger train shall have power and is required, to assign each passenger to the car, or the compartment of a car, used for the race to which such passenger belongs; and should any passenger refuse to occupy the car to which he or she is assigned by the conductor, the conductor shall have power to refuse to carry such passenger on the train, and for such refusal neither he nor the railroad company shall be liable for damages in any court."

"1351. If any persons or corporation operating a railroad shall fail to provide two or more passenger cars for each passenger train, or to divide the passenger cars by a partition, to secure separate accommodations for the white and colored races, as provided by law, or if any railroad passenger conductor shall fail to assign each passenger to the car or the compartment of the car used for the race to which the passenger belongs, he or it shall be guilty of a misdemeanor, and on conviction shall be fined not less than twenty dollars nor more than five hundred dollars."

*R. H. Thompson,* attorney for appellant.

*Henry & Canizaro* and *Carl Fox,* attorneys for appellee.

No brief of counsel on either side found in the record.

COOK, J., delivered the opinion of the court.

Appellee procured a ticket from appellant railway company which entitled her to passage on appellant's railway from Vicksburg to Meridian (both points within this state), and from the latter place, over the lines of connecting carriers, to the city of New York. In addition to the railway ticket, appellee purchased from the agent of appellant a sleeping car check entitling her to a berth on the Pullman car attached to and forming a part of appellant's train.

When appellee boarded the train at Vicksburg, she discovered as her fellow passengers three men of the negro race, and protested to the employees of appellant on the train that she or the negroes be assigned to another coach. This demand was refused, or ignored, and appellee was forced, if she occupied a sleeper at all, to retire to her berth in the same car with the berths occupied by the negro passengers. She claimed to have suffered much distress of mind and body, the result of being forced to occupy the same sleeping apartments used by men of a different race. The jury, composed of men in entire sympathy with her, returned a verdict in her favor for fifteen thousand dollars.

It is to be observed that appellee was a passenger upon a train forming one of the instrumentalities of commerce between the states; that she was taken up in this state to be carried without the state, and, indeed, across several state, to her destination, under the contract of carriage.

It is admitted that there was but a single Pullman car attached to the train; and that no arrangement of this car had been made for the separation of passengers of the different races.

We do not believe that the fact that appellant is a Mississippi corporation, with its termini within the terri-

torial limits of the state, can change the status of the carrier and the passenger, and affect the question presented by the record.

The first point made by appellant, that our statute (Code 1906, sections 1351 and 4059), was not intended to be applied to sleeping cars, it is believed, is without merit; and that the law is applicable to all cars composing the trains of common carriers doing business in this state. The statute contemplates that equal and separate accommodations should be provided for both races. It was the purpose of the Legislature to separate the races, for entirely obvious reasons and also to provide for the fair and equal treatment of the members of each race.

Again, it is insisted, since the supreme court of Mississippi and the Supreme Court of the United States have decided that the so-called "Jim Crow Act" has no application to interstate business, it is immaterial how the general question here involved may have been decided elsewhere, citing *L., N. O. & T. Ry. Co.* v. *State,* 66 Miss. 662, 6 South. 203, 5 L. R. A. 132, 14 Am. St. Rep. 599; *L., N. O. & T. Ry. Co.* v. *Mississippi,* 133 U. S. 587, 10 Sup. Ct. 348, 33 L. Ed. 784.

In our opinion, neither of the decisions support the position assumed by appellant. Both courts, in the cases cited, were construing section 1 of the act then under review, requiring separate accommodations for the races to be provided upon trains within the state, upon demurrer to an indictment against the railway company for a violation of that section, "and not for failing to assign to such separate car or compartment interstate travelers upon appellant's trains. We are not, therefore, called upon to determine whether the legislation in question would be valid if applied to persons other than those taken up within the state to be set down within it. Confining ourselves to the question necessarily involved, it being also the distinct issue presented by the plea

of the company, the inquiry is whether the state is precluded from requiring separate accommodations for purely domestic travelers of different races, because to furnish the same would impose a burden upon the carrier, or because the requirement affects interstate travel upon the trains of the company." The quotation is from the opinion of the court of this state. 66 Miss. 672, 6 South. 204, 5 L. R. A. 132, 14 Am. St. Rep. 599.

The Supreme Court of the United States, reviewing the case decided by this court, limited itself to an affirmance of the validity of the statute as interpreted by the courts of Mississippi. The act then considered required all common carriers of passengers operating in this state to provide on their trains separate accommodations for the white and colored races. The railroad company was indicted for an alleged violation of the act; and filed a special plea to the indictment, whereby it set up, in defense of its failure to provide separate accommodations, the fact that it was engaged in the interstate traffic of carrying passengers from places without the state to points within the state, and across the state and into other states. It was the position of the company in that case that they carried intrastate passengers only upon trains engaged in commerce between the states, and that to obey the law would entail a great expense, and hinder, delay, and obstruct it in making its interstate connections with other carriers of passengers. The state demurred to the plea, and the demurrer was sustained by the trial court, and this judgment of the trial court was affirmed, both by the supreme court of the state and the Supreme Court of the United States.

While both courts merely decided that the act in question, as applicable to intrastate traffic, was valid, it was not decided that it would be invalid if it was made applicable to interstate traffic.

We do not think the question presented by the record in the present case was involved in *L., N. O. & T. Ry.*

*Co.* v. *State*, except to the extent that a decision of that case, under the issues raised by the pleading, necessarily settled that a railroad company was compelled to obey the statute laws requiring them to carry sufficient equipment, even on interstate trains, to provide for the separate accommodation of the races. This was the precise point raised by the plea. The ultimate decision of the Supreme Court of the United States settled that point in favor of the jurisdiction of the state, in so far as intrastate traffic was concerned; but upon the question here involved the decision of the supreme judicial tribunal of the nation is silent.

In *Chiles* v. *Chesapeake & Ohio Ry. Co.*, 218 U. S. 71, 30 Sup. Ct. 667, 54 L. Ed. 936, 20 Ann. Cas. 980, the court decided that a railway company engaged in interstate commerce, in the absence of congressional legislation, could, by the force of self-adopted rules and regulations, compel the interstate negro passenger to occupy a coach set apart for the accommodation of colored persons alone. No question of the power of the state to accomplish the same end by statute was before the court, as the defense interposed by the company was its own regulations, and not the statutes of Kentucky.

In *Hall* v. *De Cuir*, 95 U. S. 485, 24 L. Ed. 547, the court decided precisely the same question as was subsequently before the court in *Chiles* v. *Chesapeake & Ohio Ry. Co., supra.* There was this difference, however, in the facts of the two cases: The interstate carrier in the De Cuir case was a steamboat engaged in traffic on the waters of the Mississippi river, and was licensed to do a coasting trade, and registered under the laws of Congress of the United States. A negro interstate passenger demanded her rights, guaranteed by the laws of Louisiana, which reserved to negro passengers and to white passengers the privilege of being assigned to the same cabins on the boat. In that case the negro passenger declined to occupy cabins assigned to negroes. Pre-

ferring to associate with white folk, she asked to be put
in the cabins occupied by persons of that race. There
are, of course, persons who prefer to mingle with per-
sons of a different race, even against the will of that
race, but, happily, this class is negligible in number;
but we find two of the class figuring in the decisions of
the state and national courts.

In *Stone v. Yazoo, etc., R. R. Co.,* 62 Miss. 635 (52 Am.
Rep. 193), commenting on the De Cuir case, CAMPBELL,
C. J., made the following observations: "The statute
of Louisiana requiring common carriers of passengers
to give all persons traveling in that state, upon the pub-
lic conveyance employed in such business, equal rights
and privileges in all parts of the conveyance, without
discrimination or distinction on account of race or color,
was held to be a regulation of commerce and void, even
within the state, so far as it affected vessels plying the
waters of the Mississippi river between different states.
The reason was the steamboat was enrolled and licensed
under the laws of the United States and engaged as a
regular packet between different states upon the naviga-
blae waters of the United States. The vessel was, in a
sense, an institution of the United States, deriving its
right to pursue its business from the United States and
navigating the national highway common to all and not
the property of private persons, or deriving its exist-
ence from a state. As Congress had regulated the busi-
ness by providing for licensing vessels and leaving the
license free and untrammeled as to the accommodations
of passengers, and by the common law it pertains to the
business of a common carrier to make reasonable and
suitable regulations as regards passengers, it was held
that Louisiana had no right to add a requirement not
imposed by Congress, which in regulating the matter
had left the common law in force as to this."

It would serve no good purpose to review the several
cases decided by the Supreme Court of the United States,

and cited in support of the contention of appellant, as we believe no case can be found decisive of the precise question raised in the instant case. The cases most nearly approaching the subject have been analyzed, and, in our opinion, none of them have pronounced a state statute, similar to our own, an invasion of the national authority to regulate and control commerce between the states, should it be interpeted to mean that the statute applies to interstate travelers aboard trains forming a part of a chain of carriers engaged in the business of transporting passengers taken up within the state for carriage to a point without the state. This is exactly the question involved in this case, and such a passenger is claiming damages because negro passengers were assigned to the same Pullman car to which she was assigned, and which she was compelled to occupy, or retire to one of the day coaches attached to the train; there being no sleeping car other than the one occupied by the negroes.

We find ourselves unable to reach the conclusion that the legislature intended to limit the application of the statute to that portion of the train given over to the accommodation of intrastate passengers. To so hold would be to disregard the reason which underlies this legislation.

The legislature, in the exercise of its power to police the highways of commerce running through the state, enacted the statute in question to promote the peace, comfort, and general welfare of the public.

The statute was not enacted with any idea of discriminating against the members of either race; nor was it prompted by prejudice or passion, but with the knowledge that the enforced intermingling of the races would be distasteful to both races, would inevitably result in discomfort to both, and provoke and encourage conflicts endangering the peace and quiet of the commonwealth.

True the application of the statute to interstate trains necessarily imposes an additional expense upon the car-

rier. This carrier would be required to provide another Pullman, or to divide the one used into separate compartments; but it has been decided time and again that merely an additional expenditure of money will not render a statute so requiring susceptible to criticism.

This statute has been upon our books for many years, and has caused no complaint or criticism from the inhabitants of the state. The two races here accept the law as a wise and necessary exercise of the police power of the state for the protection of members of both races. No greater punishment could be inflicted upon the average negro traveler than being obliged to sit in the coach set apart for whites, and our colored fellow citizens would be the first to oppose a repeal of the statute.

A riot upon an interstate train growing out of the refusal of common carriers to recognize a situation known to every Mississippian—black and white—would endanger the lives and disturb the peace of all persons passengers on the train, intrastate and interstate; and we therefore decline to limit the application of the statute to intrastate commerce. Possessing the knowledge of local conditions common to all residents of our section, we confess some surprise that there was no sequel to the event described by the record.

The ultimate settlement of the question rests with the Supreme Court of the United States; and, until that great court decides against the validity of the statute as construed by us, we feel impelled to adhere to our belief that the law is not only beyond criticism from a constitutional standpoint, but is also a reasonable and wise exercise 'of the police power of the state.

One more observation: If we should hold that the statute is inapplicable to interstate travelers, it seems to us that necessarily it must be condemned altogether, as the theory upon which its wisdom and justice rests will thus be declared fanciful and without foundation in fact. If the peculiar conditions existing here demanded

this legislation to conserve the peace of the state, and our lawmakers have so decided, the mere fact that the passenger is going out of the state, coming into the state from without, or traveling across the state, does not alter the complexion of affairs, nor render the danger less, should a negro or white man be required, against his will, to occupy a car with passengers of another race.

Each section of our common country has its own problems, and the laws of one state may not be necessary in another state; and that a law found to be necessary in our state should be assailed by a corporation created by the state may account for the amount of the verdict in this case. The statute in question, rather than burdening the carrier, is an aid to the peaceful operation of its business; and we have no doubt that its overthrow would create intolerable conditions, from which the railway company would be the first and greatest sufferer.

The verdict of the jury is grossly excessive, but if appellee will remit all except two thousand dollars the case will be affirmed; otherwise it will be reversed, with instructions to the trial court to retry the question of damages alone.

*Affirmed with directions.*