**EMPIRE PICTURES DISTRIBUTING COMPANY, Inc., and Kingsley International Pictures Corporation, Appellants,**

v.

**CITY OF FORT WORTH et al., Appellees.**

**No. 17808.**

United States Court of Appeals
Fifth Circuit.

Jan. 11, 1960.

John R. Brown, Circuit Judge, dissented in part.

Grover Hartt, Jr., Dallas, Tex., Ephraim London, New York City, Tobolowsky, Hartt & Schlinger, Dallas, Tex., for appellants.

Robert R. Goodrich, Fort Worth, Tex., R. E. Rouer, S. G. Johndroe, Jr., G. Gordon Whitman, Martin Siegmund, James O. Price, Fort Worth, Tex., for appellees.

Before CAMERON, JONES and BROWN, Circuit Judges.

CAMERON, Circuit Judge.

Alleging that the case arises under the Constitution of the United States, appellants Empire Pictures Distributing

Company, Inc., a Texas corporation, and Kingsley International Pictures Corporation, a New York corporation, brought this action to have two ordinances of the City of Fort Worth, Texas declared to be violative of their rights under the First and Fourteenth Amendments of the Constitution of the United States, and to have their enforcement enjoined. The defendants, appellees here, are the City of Fort Worth, a municipal corporation, its mayor, city manager and chief of police, along with the members of the Board of Censorship created by one of the ordinances.

It was alleged that Kingsley was the sole owner of the right to exhibit a motion picture film "And God Created Woman" in the United States, and that Empire was owner of the rights to distribute the film in the State of Texas, and that Empire had contracted with a theater in Fort Worth to exhibit the picture, but it had been unable to do so because the City refused to issue a permit for such exhibition, without which permit appel-lants would be subject to the penalties of one of the ordinances. The complaint charged that the ordinances provided for a system of censorship of motion pictures and that the ordinances were, on their face and as interpreted by defendants, in contravention of their rights guaranteed by the First and Fourteenth Amendments of the Constitution.

Copies of the two ordinances were attached to the complaint.[1] It was alleged that the film was "not obscene, and that its exhibition would not violate any valid law or statute of the State of Texas or ordinance or regulation of the City of Fort Worth." It was further alleged that the Boards were without any legal authority to attempt the censoring and to restrict the licenses of the motion picture. Both the Board of eight members and the Board augmented by the three "Referees" denied a permit for the exhibition unless five designated scenes should be deleted.

Plaintiffs thereupon filed their complaint and prayed for judgment declaring

1. Pertinent portions of Ordinance No. 3219 are these: "No person, firm or corporation shall print, publish, design, prepare, import, distribute, exhibit, display, sell, possess, with intent to sell, offer for sale, loan or give away to a minor a book, pamphlet, magazine, printed paper, phonograph record, drawing, picture, photograph, figure, image, article or instrument or other thing which is obscene, immoral, lewd, lascivious or indecent, tending to incite minors to violent, depraved or immoral acts or that otherwise manifestly tends to the corruption of the morals of minors."

The other ordinance, No. 3475, creates a Board of Censors to supervise motion picture exhibitions and other forms of theatrical entertainment, requires a permit to exhibit a motion picture, prohibiting such exhibition without a permit, prescribes regulations for the granting or refusal of permits, regulates advertisements, etc. The Board of Censors was to consist of four men and four women whose duty it was to supervise all motion picture exhibitions, and its decisions were subject to appeal to a board consisting of its own membership supplemented by three named officials of the City of Fort Worth or Tarrant County. The Board was given the right to have motion pic-tures shown in advance to its membership; had a right to refuse a permit "if a majority of the Board of Censors * * * shall condemn said picture or other form of theatrical entertainment as being indecent or injurious to the morals of the citizens, or as tending to promote or encourage indecency, immorality, or racial or sectional prejudices, or juvenile delinquency."

Violation of either of the ordinances was declared to be a misdemeanor upon conviction of which a fine not to exceed $200.00 for each day might be levied.

Attached to the complaint also was a copy of Article 527 (509) of the Texas Code, Vernon's Ann.P.C. art. 527, providing punishment of any person who should engage in exhibition of lewd, lascivious or depraved motion pictures, or any figure, image, article or thing portraying nude or partly denuded female figures in compromising and obscene poses. The action did not involve any state officer, however, and no part of the argument is devoted to an attack upon this State statute. In fact, in the argument it was conceded that the district judge properly refused to have a three-judge court convened upon the admission that no State statute was involved.

the actions of the defendants in refusing the license to be in violation of their constitutional rights and their valuable property rights, and that they be forever restrained and enjoined from taking any action or proceeding by punitive action or otherwise that would or might in any way interfere with the exhibition of the motion picture film.

After the defendants had answered, the court at pretrial hearing declined to witness the exhibition of the picture and required that the hearing be upon oral testimony. Both sides put on their witnesses and the court made its findings in favor of the defendants and against plaintiffs, and approved the denial of the permit unless the several scenes from the picture were eliminated in line with the findings of the two Boards. Based upon these findings a judgment was entered dismissing the action on its merits, from which judgment this appeal was prosecuted.

At the threshold of the case lies the question whether the trial court ought not *sua sponte* to have withheld action "while the parties repair[ed] to a state tribunal for an authoritative declaration of applicable state law." Since our answer to this question will dispose of the appeal, no further statement need be made of the evidence introduced in the hearing of the merits.

Five decisions rendered by the Supreme Court in the current year furnish a clear guide for the disposition of this appeal.[2] The opinion of the Court in Thibodaux and the dissenting opinion of three of the Justices bring several facets of the question into sharper focus than the others and will be discussed first and at some length.

The City of Thibodaux, Louisiana enlarged its limits and, acting under Louisiana Statutes, filed in the proper Louisiana Court condemnation proceedings aimed at taking over that portion of the private electric utility system owned by the Power Company which served the annexed portion of Thibodaux. Based upon diversity of citizenship, the Power Company removed to the federal court. Citing Leiter Minerals, Inc. v. United States, 352 U.S. 220, 229, 77 S.Ct. 287, 1 L.Ed.2d 267, the District Court *sua sponte* stayed the proceedings before it until the Supreme Court of Louisiana had been afforded an opportunity to interpret, under declaratory judgment procedures, the statutes of Louisiana involved in the expropriation proceedings.[3] Upon Thibodaux's appeal the Court of Appeals for the Fifth Circuit reversed and remanded the case for trial by the United States District Court,[4] holding that, since expropriation proceedings were not of equitable jurisdiction and no exceptional circumstances were present which would require or permit the District Court to delay its determination, the trial court should have proceeded to trial on the merits. The opinion cited and discussed many of the Supreme Court cases by which the rule of abstention had been evolved. The Supreme Court granted certiorari[5] and expounded at length the character of expropriation proceedings, holding that despite their special and peculiar nature, there was no deterrent to a stay of proceedings pending State action. Some of the general language of the decision deserves quotation:

*"We have increasingly recognized the wisdom of staying actions in the federal courts pending determination by a state court of decisive*

2. City of Meridian v. Southern Bell Telephone & Telegraph Co., Feb. 24, 1959, 358 U.S. 639, 79 S.Ct. 455, 3 L.Ed.2d 562; Louisiana Power & Light Co. v. City of Thibodaux, June 8, 1959, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058; County of Allegheny v. Frank Mashuda Co., June 8, 1959, 360 U.S. 185, 79 S.Ct. 1030, 3 L.Ed.2d 1163; Martin v. Creasy, June 8, 1959, 360 U.S. 219, 79 S.Ct. 1034, 3 L.

Ed.2d 1186; and Harrison v. National Association for the Advancement of Colored People et al., June 8, 1959, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152.

3. City of Thibodaux v. Louisiana Power & Light Company, 153 F.Supp. 515.

4. Id., 255 F.2d 774.

5. 358 U.S. 893, 79 S.Ct. 154, 3 L.Ed.2d 120.

issues of state law. Thus in Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 499, 61 S.Ct. 643, 644, 85 L.Ed. 971, it was said:

" 'Had we or they [the lower court judges] no choice in the matter but to decide what is the law of the state, we should hesitate long before rejecting their forecast of Texas law. But no matter how seasoned the judgment of the district court may be, it cannot escape being a forecast rather than a determination.' * * But where the issue touched upon the relationship of City to State, City of Chicago v. Fieldcrest Dairies, Inc., 316 U.S. 168, 62 S.Ct. 986, 86 L.Ed. 1355, or *involved the scope* of a previously uninterpreted state statute which, if applicable, was of questionable constitutionality, Leiter Minerals, Inc. v. United States, 352 U.S. 220, 229, 77 S.Ct. 287, 292, 1 L.Ed.2d 267, we have *required district courts, and not merely sanctioned an exercise of their discretionary power,* to stay their proceedings pending the submission of the state law questions to state determination.

"These prior cases have been cases in equity, but they did not apply a technical rule of equity procedure. *They reflect a deeper policy derived from our federalism.* We have drawn upon the judicial discretion of the chancellor to decline jurisdiction over a part or all of a case brought before him. See Railroad Commission of Texas v. Pullman Co. supra. * * * A determination of the nature and extent of delegation of the power of eminent domain concerns the apportionment of governmental powers between City and State. The issues normally turn on *legislation with much local variation interpreted in local settings.* The considerations that prevailed in conventional equity suits for avoiding the hazards of serious disruption by federal courts of state government or needless friction between state

and federal authorities are similarly appropriate in a state eminent domain proceeding brought in, or removed to, a federal court.

" * * * The justification for this power, to be exercised within the indicated limits, lies in *regard for the respective competence of the state and federal court systems* and for the maintenance of harmonious federal-state relations in a matter close to the political interests of a State." 360 U.S. at pages 27–29, 79 S.Ct. at page 1072. [Emphasis supplied.]

Two Justices joined in a vigorous dissenting opinion by Mr. Justice Brennan. A brief quotation from the dissent will serve to indicate the extent to which the dissenting Justices felt that the action and language of the court in Thibodaux departed from principles theretofore recognized:

"Until today, the standards for testing this order of the District Court sending the parties to this diversity action to a state court for decision of a state law question might have been said to have been reasonably consistent with the imperative duty of a District Court, imposed by Congress under 28 U.S. C. §§ 1332 and 1441, 28 U.S.C.A. §§ 1332, 1441 to render prompt justice in cases between citizens of different States. To order these suitors out of the federal court and into a state court in the circumstances of this case passes beyond disrespect for the diversity jurisdiction to a plain disregard of this imperative duty. The doctrine of abstention, in proper perspective, is an extraordinary and narrow exception to this duty, and abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve one of two important countervailing interests: either the avoidance of a premature and perhaps unnecessary decision of

a serious federal * * * question, or the avoidance of the hazard of unsettling some delicate balance in the area of federal-state relationships.

"These exceptional circumstances provided until now a very narrow corridor through which a District Court could escape from its obligation to decide state law questions when federal jurisdiction was properly invoked." 360 U.S. at pages 31–32, 79 S.Ct. at page 1074.

Thereupon the dissenters proceed to analyze the extent to which the Court's decision represents a departure from what they conceived to be proper limitations of abstention. They point out, first, that the Power Company was not asking injunctive relief which would prohibit state officials from acting. Next, they emphasize that "the State of Louisiana, represented by its constituent organ the City of Thibodaux, urges the District Court to adjudicate the state law issue." And they ask, 360 U.S. at page 35, 79 S.Ct. at page 1076, "How, conceivably, can the Court justify the abdication of responsibility to exercise jurisdiction on the ground of avoiding interference and conflict with the State when the State itself desires the federal court's adjudication?" They close, 360 U.S. at page 44, 79 S.Ct. at page 1081, with the assertion:

"One must regret that this Court's departure from the long-settled criteria governing abstention should so richly fertilize the Power and Light Company's strategy of delay * * * It is especially unfortunate in that departure from these criteria fashions an opening wedge for District Courts to refer hard cases of state law to state courts in even the routine diversity negligence and contract actions."

The Creasy case involved an effort by property owners abutting on a highway in Pennsylvania to have their rights declared and protected by injunction against the projected action of Pennsylvania officials towards making a highway one of "limited access." They attacked the constitutionality of the Pennsylvania statute permitting this to be done. After the United States District Court had issued a restraining order, a three-judge court stayed its proceedings to permit the parties to have their rights determined in the courts of Pennsylvania. After litigation in the state courts, including the Supreme Court of Pennsylvania,[6] had relegated the property owners to the procedures prescribed by the Limited Access Highways Act, 36 P.S. § 2391.1 et seq., the three-judge court resumed activity and found that statute violative of the Fourteenth Amendment and enjoined the State officials from taking the planned action.[7] The Supreme Court, upon direct appeal, reversed, finding the circumstances which should impel a federal court to "abstain from blocking the exercise by state officials of their appropriate functions" [360 U.S. 219, 79 S.Ct. 1037] were present in a marked degree. The short opinion referred to several of the cases discussed in Thibodaux and added: "At least one additional reason for abstention in the present case is to be found in the complex and varying effects which the contemplated state action may have upon the different landowners."[8]

The only one of the five cases holding against abstention was the five-hour decision in the Mashuda case supra. Mr. Justice Stewart, concurring in Thibodaux, found the two cases "totally unlike," calling attention to the fact that the Supreme Court merely held in Mashuda that it was error for the District

---

6. Creasy v. Lawler, 389 Pa. 635, 133 A.2d 178.

7. Creasy v. Stevens, 160 F.Supp. 404.

8. In his dissent, Mr. Justice Douglas lamented that:
"We have witnessed in recent times a hostility to the exercise by federal courts of their power to declare what a citizen's rights are under local law and diversity cases * * * and in cases where federal rights are invoked." [Citing in addition to the Thibodaux and Harrison cases, Public Service Commission of Utah v. Wycoff Co., 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291.]

Court to dismiss the complaint; and that Mashuda involved only factual issues, the controlling state law being clear. The application for an injunction had been withdrawn so as to escape the provisions of 28 U.S.C.A. § 2283.

The City of Meridian case, first of the five, was an action for *declaratory judgment* brought by Southern Bell Telephone and Telegraph Company to establish its perpetual franchise over the streets of the City under a statute passed in 1886. Southern Bell claimed to have accepted the terms of the statute by installing its lines (actually those of a predecessor) on the City's streets. The District Court [9] declared unconstitutional a 1956 statute of the State of Mississippi authorizing cities to charge telephone companies for use of their streets, and entered a declaratory judgment as prayed for. The Court of Appeals for the Fifth Circuit affirmed.[10] The City moved, when the case reached the Supreme Court, that the judgments below be vacated and the action remanded for the convention of a three-judge court. The Telephone Company countered with another motion, neither raising the question of abstention. But the Supreme Court raised the question *sua sponte* holding (358 U. S. 639–641, 79 S.Ct. 455, 456, 3 L.Ed.2d 562):

"Proper exercise of federal jurisdiction requires that controversies involving unsettled questions of state law be decided in the state tribunals preliminary to a federal court's consideration of the underlying federal constitutional questions * * * That is especially desirable where the questions of state law are enmeshed with federal questions * * * Here, the state law problems are delicate ones, the resolution of which is not without substantial difficulty—certainly for a federal court * * * In such a case, when the state court's interpretation of the statute or evaluation of

its validity under the state constitution may obviate any need to consider its validity under the Federal Constitution, the federal court should hold its hand, lest it render a constitutional decision unnecessarily."

Harrison v. National Association for the Advancement of Colored People originated as an action by the Association to enjoin, because of their alleged unconstitutionality, five statutes enacted by the Legislature of Virginia in 1956. With one judge dissenting,[11] a three-judge court issued the requested injunction as to three chapters, but reserved decision upon two until they could be passed upon by the Virginia courts. The statutes were aimed at the alleged activities of the Association in advocating legislation and assisting in the defense of suits brought with respect to segregation laws of Virginia. The Supreme Court reversed, holding that the federal court should have abstained until the courts of Virginia had passed upon all of the statutes, using in part this language (360 U.S. at page 176 et seq., 79 S.Ct. at page 1030):

"According every consideration to the opinion of the majority below, we are nevertheless of the view that the District Court should have abstained from deciding the merits of the issues tendered it, so as to afford the Virginia courts a reasonable opportunity to construe the three statutes in question. * * *

"*This now well-established procedure is aimed at the avoidance of unnecessary interference by the federal courts with proper and validly administered state concerns, a course so essential to the balanced working of our federal system.* To minimize the possibility of such interference a 'scrupulous regard for the rightful independence of state governments * * * should at all times actuate the federal courts,'

9.  154 F.Supp. 736.

10. 256 F.2d 83.

11. National Association for the Advancement of Colored People v. Patty, D.C., 159 F.Supp. 503.

Matthews v. Rodgers, 284 U.S. 521, 525, 52 S.Ct. 217, 219, 76 L.Ed. 447, as their 'contribution * * * furthering the harmonious relation between state and federal authority * * *' * * * In the service of this doctrine, which this Court has applied in many different contexts, no principle has found more consistent or clear expression than that the federal courts should not adjudicate the constitutionality of *state enactments fairly open to interpretation* until the state courts have been afforded a reasonable opportunity to pass upon them. * *

"The present case, in our view, is one which calls for the application of this principle, since we are unable to agree that the terms of these three statutes *leave no reasonable room for construction* by the Virginia courts which might avoid in whole or in part the necessity for federal constitutional adjudication, or at least *materially change the nature of the problem.*

\* \* \* \* \* \*

"*The possibility of limiting interpretation,* characteristic of constitutional adjudication, also cannot be ignored. * * *

" * * * All we hold is that these enactments should be exposed to state construction or limiting interpretation before the federal courts are asked to decide upon their constitutionality, so that federal judgment will be based on something that is a complete product of the State, the enactment as phrased by its legislature and as construed by its highest court." [12] [Emphasis supplied.]

These actions of the Supreme Court in recent days and the language used by it point clearly, in our opinion, to an increasing recognition of the important role of the States in the proper functioning of the partnership of sovereignties which is the American System. That attitude has its base, according to the Court's opinions, in the practice of a "scrupulous regard for the rightful independence of state governments"—"a course so essential to the balanced working of our federal system," rather than in the tendency, voiced by the minority, of utilizing the presence of a state law question as a "convenient excuse for abstention."

Before leaving the discussion of the holdings of the five recent decisions it is desirable to point out that, in 1955,[13] the Supreme Court had emphasized the importance of the change in language which the enactment of Title 28 U.S.Code in 1948 brought about. The statute which had theretofore been § 265 of the Judicial Code was revised in the 1948 enactment so as to read:[14]

---

12. The dissenting opinion expressing the views of three Justices further illuminates the character of the Supreme Court's approach to the problem by accentuating their point of disagreement with it:

"The rule invoked by the Court to require the Federal District Court to keep hands off this litigation until the state court has construed these laws is a judge-made rule. It was fashioned in 1941 in the decision of Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971, as a device to avoid needless decisions under the Federal Constitution where a resolution of state law questions might make those adjudications unnecessary. Since that time, the rule of the Pullman case has been greatly expanded. It has indeed been extended so far as to make the presence in federal court litigation of a state law question a convenient excuse for requiring the federal court to hold its hand while a second litigation is undertaken in the state court. * * *

" * * * Where state laws make such an assault as these do on our decisions and a State has spoken defiantly against the constitutional rights of the citizens, reasons for showing deference to local institutions vanish. * * *" [360 U.S. at pages 179 et seq. and 182, 79 S.Ct. at pages 1031, 1033].

13. Amalgamated Clothing Workers of America v. Richman Bros. Co., 348 U.S. 511, 75 S.Ct. 452, 99 L.Ed. 600.

14. 28 U.S.C.A. § 2283.

"A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

Richman had brought a proceeding in a State court of Missouri to enjoin picketing by Amalgamated, alleging that it was being conducted in furtherance of a common-law conspiracy. Asserting that the field had been occupied by the Taft-Hartley Act, 29 U.S.C.A. § 141 et seq. so that only the District Court of the United States had jurisdiction,[15] Amalgamated filed action in the federal court to restrain the prosecution of the State court proceeding. The District Court dismissed, the Court of Appeals for the Sixth Circuit affirmed,[16] and the Supreme Court approved their actions, holding that the quoted statute constituted "Legislative policy * * * in a clear-cut prohibition qualified only by specifically defined exceptions." [348 U. S. 511, 75 S.Ct. 455.] Responding to the argument that to permit State courts to entertain jurisdiction which had so manifestly been vested in the federal courts under Taft-Hartley would bring about a situation where "delay will not only undercut the legislative scheme, but opportunity for effective union activity may be diminished if not lost," the Supreme Court said (348 U.S. at pages 518–519, 75 S.Ct. at page 456):

"The assumption upon which the argument proceeds is that federal rights will not be adequately protected in the state courts, and the 'gap' complained of is impatience with the appellate process if state courts go wrong. But during more than half of our history Congress, in establishing the jurisdiction of the lower federal courts, in the main relied on the adequacy of the state judicial systems to enforce federal rights, subject to review by this Court. With limited exceptions, it was not until 1875 that the lower federal courts were given general jurisdiction over federal questions. During that entire period, the vindication of federal rights depended upon the procedure which petitioner attacks as so grossly inadequate that it could not have been contemplated by Congress. The prohibition of § 2283 is but continuing evidence of confidence in the state courts, reinforced by a desire to avoid direct conflicts between state and federal courts. * * *"

Under the standards set by these cases containing the latest words from the Supreme Court, it is clear that the court below ought not to have proceeded to trial on the merits. Appellants here seek to challenge and arrest state action in the exercise of its police power after having participated in the administrative process attending the issuance of permits to the point of requesting a hearing before the Appeals Board. Before us, therefore, is a clear-cut case of collision between a State acting through "its constituent organ, the city" of Fort Worth and a subordinate court of the United States. The matter sought to be settled is one which would logically "turn on legislation with much local variation interpreted in local settings." Under the authorities discussed, the question of constitutionality should not have been decided until the Court could have before it the whole picture with which it was called upon to deal,—that is, the provisions of a statute or ordinance couched in language of legislative selection plus the meaning of that language as precisely fixed by the highest judicial authority of the State.

■ Particularly is this recognized principle important in a case such as this where the proscribed action is confined within closely defined limits so that it is inherently difficult to test the general language of the legislative enact-

15. 28 U.S.C.A. § 1337 and cf. Weber v. Anheuser-Busch, Inc., 1955, 348 U.S. 468, 75 S.Ct. 480, 99 L.Ed. 546.

16. 211 F.2d 449.

ment to determine whether those limits have been transcended.

One of the challenged ordinances prohibits the exhibition of materials or objects which are "obscene, immoral, lewd, lascivious or indecent." The other prohibits the issuance by the Board of Censors of a permit for the showing of a moving picture which is, in the opinion of the Board, "indecent, or injurious to the morals of the citizens of Fort Worth or which would tend to promote or encourage indecency, immorality, or racial or sectional prejudices, or juvenile delinquency." [17]

The Complaint refers to the wording of the minutes of the Appeal Board to the effect that the license would be issued if the film should be shown only to adults and if four scenes were eliminated; " * * * with such limitations the picture would not arouse a prurient desire on the part of the public; otherwise it would." Reference is made also to a communication from the Chairman of the Board of Censors containing the sentence: "The Censor Board and the Referees felt that this picture, like many others offered to the public, were too suggestive and not up to the desired moral standard." Appellants complain also that the two Boards interpreted the city ordinance in a manner not justified by the wording of the ordinance.

Moreover, the Complaint charges and appellants argue at length with citation of many authorities that the ordinance is "void for vagueness." They cite a large number of cases where statutes or ordinances have been stricken down because the language used in them did not sufficiently describe the crime charged, and they rely upon the recent case from the Supreme Court, Roth v. United States, 1957, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, as fixing the nebulous boundary line between sex as obscenity and sex as the portrayal of art and literature.

They couple with these contentions the claim that it would serve no useful purpose to have a state court of Texas consider the questions raised in the present action, because the appellate courts of Texas have [18] upheld the constitutionality of a city ordinance of Houston couched in language quite similar to the language of the ordinance here under attack. We do not agree. A careful reading of the questions raised by the Amusement Company there fails to reveal any mention of a claim that the Houston ordinance violated the Constitution of the United States. The entire argument dealt with the Texas Constitution and statutes, it being claimed that the municipality did not possess the asserted powers under Texas law. Further, the attack on the ordinance challenged only the general power of the municipality to pass it, no mention being made of any particular picture, and no claim being asserted that the ordinance was illegal because of the manner in which it was being administered.[19]

Aside from these considerations we cannot fail to note the fact that the Supreme Court in its recent decisions has approved abstention where state statutes are "enmeshed with federal questions," involve "enactments fairly open to interpretation," or leave "reasonable room for construction" which may "materially change the nature of the problem;" or

17. Appellants' attorney stated in one of his arguments to the Court during the trial on the merits that "it is the plaintiff's understanding of the law that the question of obscenity, as such, or indecency, whichever one of these terms we use—counsel, I think, has agreed they are interchangeable for all practical purposes—that that is a fact question * *."

18. Xydias Amusement Co. v. City of Houston, Tex.Civ.App. Galveston, 1916, 185 S.W. 415, writ refused.

19. We pass over the argument of appellants that "in the early days of the motion picture industry many decisions recognized the right of state and municipal agencies to censor motion picture entertainment. Now, in nearly every instance, these ordinances and statutes have been declared unconstitutional; * * *."

where there is "possibility of limiting interpretation [if] * * * exposed to state construction." [360 U.S. 167, 79 S.Ct. 1030.] Having these tests in mind, we cannot read the pleadings with the exhibits and the documents referred to and the general terms employed in the attack upon the ordinances without reaching the firm conviction that the cases discussed supra call for abstention by the federal courts in favor of prior state court action.

■ Finally, it is clear that the federal courts should defer to state courts, because of the long settled principle that a federal court will intervene in a state's enforcement of its criminal laws only in extreme cases. One or two Supreme Court decisions will suffice to show that the principle is deep-rooted in our jurisprudence.

■ The two ordinances under attack here create misdemeanors only, punishable by maximum fines of $200.00 for each day's violation. The basic thrust of the Complaint is to procure a federal holding in appellants' favor to escape being subjected to being fined for showing the picture without first obtaining a permit. The action of the Supreme Court in Douglas v. City of Jeannette, 1943, 319 U.S. 157, 63 S.Ct. 877, 87 L. Ed. 1324, illustrates that such a course may not be followed.

Jeannette had an ordinance requiring those who solicited within its borders to procure a license before beginning such solicitation. A group of Jehovah's Witnesses refused to observe the requirements of the ordinance, being convinced that it was inconsistent with the teachings of their religion. When the city officials asked that they refrain from approaching the residents of the city, they decided upon a mass infiltration and brought one hundred Witnesses into the city to solicit in defiance of the ordinance. It was necessary to call out the fire department to supplement the efforts of the small police force. A score of the Witnesses were arrested and some were convicted, and their cases were affirmed by the state appellate court.[20] Taking the case upon certiorari, the Supreme Court of the United States reversed the convictions,[21] holding the ordinance unconstitutional.

Following these convictions some of the Witnesses brought proceedings in the United States District Court to restrain the enforcement of the ordinance, which resulted in the entry of orders enjoining its enforcement.[22] The Court of Appeals for the Third Circuit reversed,[23] the Supreme Court granted certiorari[24] and upon hearing affirmed the action of the Court of Appeals[25] stating, "we find no ground for supposing that the intervention of a federal court, in order to secure petitioners' constitutional rights, will be either necessary or appropriate." Here is some of the language of the opinion:[26]

"The power reserved to the states under the Constitution to provide for the determination of controversies in their courts may be restricted by federal district courts only in obedience to Congressional legislation in conformity to the Judiciary Article of the Constitution. Congress, by its legislation, has adopted the policy, with certain well defined statutory exceptions, of leaving generally to the state courts the trial of criminal cases arising under

20. Commonwealth v. Murdock, 149 Pa. Super. 175, 27 A.2d 666.

21. Murdock v. Commonwealth of Pennsylvania, 1943, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292.

22. Douglas v. City of Jeannette, D.C.W.D. Pa.1941, 39 F.Supp. 32, and cf. Reid v. Borough of Brookville, Pa., D.C.W.D. Pa.1941, 39 F.Supp. 30.

23. 1942, 130 F.2d 652.

24. 318 U.S. 749, 63 S.Ct. 660, 87 L.Ed. 1125.

25. Douglas v. City of Jeannette, 1943, 319 U.S. 157, 63 S.Ct. 877, 882, 87 L.Ed. 1324.

26. 319 U.S. at pages 163–164, 63 S.Ct. at page 880.

state laws, subject to review by this Court of any federal questions involved. * * *

" * * * No person is immune from prosecution in good faith for his alleged criminal acts. Its imminence, even though alleged to be in violation of constitutional guaranties, is not a ground for equity relief since the lawfulness or constitutionality of the statute or ordinance on which the prosecution is based may be determined as readily in the criminal case as in a suit for injunction. * * * Where the threatened prosecution is by state officers for alleged violations of a state law, the state courts are the final arbiters of its meaning and application, subject only to review by this Court on federal grounds appropriately asserted. Hence the arrest by the federal courts of the processes of the criminal law within the states, and the determination of questions of criminal liability under state law by a federal court of equity, are to be supported only on a showing of danger of irreparable injury 'both great and immediate.' * * *

" * * * It does not appear from the record that petitioners have been threatened with any injury other than that incidental to every criminal proceeding brought lawfully and in good faith, or that a federal court of equity by withdrawing the determination of guilt from the state courts could rightly afford petitioners any protection which they could not secure by prompt trial and appeal pursued to this Court."

The principles enunciated in Jeannette have had wide application. One case is worthy of note where the right sought to be safeguarded in the federal court arose, as did that in Jeannette, under a Civil Rights Act, 42 U.S.C.A. §§ 1981–1983.[27] Stefanelli et al. sought federal relief by injunction from threatened use in a state criminal prosecution of evidence admittedly obtained in violation of the Fourth Amendment. Both the District Court and the Court of Appeals declined to intervene, dismissing the complaints. The Supreme Court affirmed, using this language:[28]

" * * * The maxim that equity will not enjoin a criminal prosecution summarizes centuries of weighty experience in Anglo-American law. It is impressively reinforced when not merely the relations between coordinate courts but between coordinate political authorities are in issue. The special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law, has been an historic concern of congressional enactment, see, e. g., 28 U.S.C. §§ 1341, 1342, 2283, 2284(5), 28 U.S.C.A. §§ 1341, 1342, 2283, 2284(5). This concern has been reflected in decisions of this Court, not governed by explicit congressional requirement, bearing on a State's enforcement of its criminal law. (Citing several cases.) It has received striking confirmation even where an important countervailing federal interest was involved. * *

"These considerations have informed our construction of the Civil Rights Act. * * * Regardless of differences in particular cases, however, the Court's lodestar of adjudication has been that the statute 'should be construed so as to respect the proper balance between the States and the federal government in law enforcement.' * * *

"If these considerations limit federal courts in restraining State prosecutions merely threatened, how much more cogent are they to prevent federal interference with proceedings once begun. * * *

"The consequences of exercising the equitable power here invoked are

---

27. Stefanelli v. Minard, 1951, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138.

28. 342 U.S. at pages 120–123, 72 S.Ct. at page 120.

not the concern of a merely doctrinaire alertness to protect the proper sphere of the States in enforcing their criminal law. If we were to sanction this intervention, we would expose every State criminal prosecution to insupportable disruption. Every question of procedural due process of law—with its far-flung and undefined range—would invite a flanking movement against the system of State courts by resort to the federal forum, with review if need be to this Court, to determine the issue. * * *

"* * * A proper respect for those relations requires that the judgment below be affirmed."

The federal Complaints in the last two cases were dismissed, as were the Complaints in a number of the cases cited in the several decisions we have discussed *supra*. In the present case, we think that full protection of the rights of the parties can be afforded by abstention from action by the District Court while the parties, if they so desire, repair to the State courts of Texas for the adjudication of their rights. Such a course is, in our opinion, required by the teachings of the cases we have discussed. The judgment of the District Court is therefore vacated and the cause remanded for proceedings consistent with this opinion.

Vacated and remanded.

JOHN R. BROWN, Circuit Judge (concurring in part and dissenting in part).

I concur readily in the reversal of the District Court's judgment, but, with deference, I dissent from the holding that this is a case for abstention with it thereafter remaining in a state of limbo while the parties repair to the long, tortuous and wholly superfluous process of a suit in the state courts of Texas. Neither party desires this. On the contrary, each urges us to decide the case.

The claim of plaintiffs is bottomed on 28 U.S.C.A. § 1331 and challenges directly the constitutionality of the ordinance and decision of the Board of Censors. It is not a mere diversity case.

Neither the doctrine of abstention nor the preservation of federalism requires or permits a federal court—to whom Congress has committed jurisdiction of a specified controversy—to escape the awful responsibility of adjudication merely because the validity of a state law or state action is at issue. There must be something more.[1]

That something more may at times be uncertainty as to state interpretation of the state statute as a predicate for determination whether there is really presented a federal constitutional problem. But that, too, is a relative, not an absolute. It must be assayed in the light of the statute or field of regulation involved, not declared upon some doctrinaire basis.

What is left for the Texas courts here?

Not the construction of the ordinance.[2] The ordinance cannot pass muster as a valid right to censor for material which,

---

1. This is discussed at great length by Professor Charles Alan Wright, The Abstention Doctrine Reconsidered, 37 Texas L.Rev. 815 (1959).

2. Ordinance 3475 creates a Board of Censors for the City of Fort Worth. It is the duty of the Board "to supervise all motion picture exhibitions * * * and to cause the suppression of any such entertainment deemed by the Board indecent or injurious to the morals of the citizens, or encouraging or promoting juvenile delinquency." An exhibitor must apply for a permit. But "no permit shall be issued * * * for the showing of

motion pictures * * * which are, in the opinion of the Board, indecent or injurious to the morals of the citizens of Fort Worth, or which would tend to promote or encourage indecency, immorality or racial or sectional prejudices, or juvenile delinquency."

No permit shall be issued if the Board after inspection "shall condemn said picture * * * as being indecent or injurious to the morals of the citizens, or as tending to promote or encourage indecency, immorality, or racial or sectional prejudices, or juvenile delinquency."

The Board is also given the power to require the exhibitor to submit "advertis-

in the Board's opinion, is "injurious to the morals of the citizens of Fort Worth" or which would "tend to promote or encourage * * * immorality" or which would tend to promote "racial or sectional prejudices" or would encourage "juvenile delinquency." All such standards have been knocked out.[3]

This leaves only material which, in the opinion of the Board, is "indecent" or that which would tend to "promote or encourage indecency." And as to this it is further limited as the parties and the court below concede that the ordinance term "indecent" is synonymous with "obscene." But Texas has little elbow room in construing obscene. It can go in only one direction—giving it a quality making it more and more restrictive as to what is forbidden. For Roth v. United States, 1957, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, prescribes the minimum required for valid state censorship—that the suspected material must appeal to the prurient interests of the average person of the community. Texas may make that standard more severe. But it may not lessen it to make subject to censorship that which Roth would declare to be within the realm of protected free expression of ideas.

Nor, on this record, is there any leeway for Texas to decide whether this film meets the Roth prurient interests formula. That is to say, there is no evidence in this record of a fully developed trial which would permit any court—state or federal—to hold that this film appealed to the prurient interests of the average person of metropolitan Fort Worth.

The Board of Censors certainly did not think so. For its approval as a showing for adults only was conditioned upon the excision of four scenes. And its stated reasons reflect the vague standards of moral censorship applied: "The Censor Board and the Referees felt that this picture, like many others offered to the public, was too suggestive and not up to the desired moral standard."

Nor did the District Court consider either that the Board of Censors had applied any such standard, or that this was the standard to be followed.[4] Indeed, the Court concluded that Fort Worth could establish a board of moral censors who were clothed with the power to determine whether a movie was "a desirable picture for the good of society." On that approach he held that there was evidence to support the Board's order of

ing copy, including photographs, newspaper cuts, and drawings to be displayed in connection with such picture, * * * and cause said exhibitor to eliminate any such advertising deemed by the Board objectionable on the grounds of indecency or immorality, or being misleading."

3. See Note, 37 Texas L.Rev. 339 (1959); see the general discussion of the censorship cases by Doan, Sax & Waite, Per Curiam Decisions of the Supreme Court: 1957 Term, 26 U.Chi.L.Rev. 309–313 (1959).

4. While the Board's minutes reflected that "it was the opinion of the Appeal Board that with such eliminations [the deletions of four scenes] the picture would not arouse a prurient desire on the part of the public; otherwise, it would," the District Judge thought his function was exhausted once he determined whether the Board had "abused its discretion in rejecting this picture."

The District Judge then analyzed, in his informal oral findings, testimony from members of the Board of Censors. One had emphasized that the "whole tenor of the picture was to make a mockery of the marriage fidelity, one of the sacred thing of life." Among these sacred things, the Court reasoned, were those things "we call conventionalities." The Judge put it this way. "And one of the sacred things that has made the English people * * * a people of high ethics * * * has been those things that have come down to them in a measure from what we call the Victorian Regime or era, and out of that has grown a certain thing that we call conventionalities. Those conventionalities of society restrain people from using language, certain words. Those conventionalities restrain people from doing certain things in certain ways in good company."

censorship since the picture "lessens to a degree, or a considerable degree, the social restraints that conventionalities place on society." [5]

And finally had the District Court faced up to the prurient-Roth formula it could not, on this record, have declared the picture obscene. In the first place, the Court declined the urgent proffer of a private showing of the film. By a sort of modern compurgation he allowed each side to produce three witnesses to describe the movie and its questionable scenes. This, as to be expected, was about as revealing as program notes to a symphony concert. We have compounded the confusion by rejecting a similar formal proffer long in advance of argument and submission.

The result is that in the serious field of trespass by municipal functionaries [6] on the hard-fought-hard-won principle of free expression of ideas, determination of the underlying constitutional problems of great magnitude has been left to a nonjudicial body with the judicial review thereof being based, not on what is really portrayed in the film, but by what persons say they saw or thought they saw.

Granted that Roth measures obscenity in terms of community standards as to which evidence for the enlightenment of the trier is appropriate, if not constitutionally mandatory,[7] the decision wheth-er censorship of the material offends the First or Fourteenth Amendments is finally and inevitably, one of federal, not state, law.

There is and can be no escape from the travail of critical inquiry and the agony of judicial decision to test finally whether state censorship action was unconstitutionally applied because of the intrinsic content of the challenged material.[8] This is a responsibility committed to all federal courts no less than to the Supreme Court. We have no right to withdraw from decision or spare the District Court that duty pending a declaration by state courts of what, in the final analysis, can be but an advisory opinion on the very matter which the First and Fourteenth Amendments and the supremacy clause of Article VI make a matter of federal constitutional law.

While the vehicle may be something less than morally attractive, the plaintiff here is asserting a right which history and our Constitution regard as of transcendent value. A Board of Censors stands in the way of free expression. Whether that action accords with the Constitution is the question. It is a question which the District Court, and thereafter this Court, should decide. We cannot run from responsibility or wish it off onto the state courts.

I therefore dissent.

5. The Court earlier reasoned: "Now, if the Board was correct in reaching the conclusion that this picture was calculated to loosen the restraint that these conventionalities exercised on polite society so that they would be freed from their restraint of these conventionalities that have been in existence among us, and that the public would, as a result, become more lax in our language and morals, then the Board, * * * would be warranted in saying that the picture was not a desirable picture. * * * This Board was a fact finding Board and they have brought in their verdict that this was not a desirable picture for the good of society * * *."

6. No disparagement is meant of the individuals comprising the Board. Undoubtedly they are dedicated and well thought of citizens undertaking conscientiously to perform a public service.

7. See the concurring opinion of Mr. Justice Frankfurter, Smith v. People of State of California, 80 S.Ct. 215, at page 222, and that of Mr. Justice Harlan, 80 S. Ct. at page 227.

8. See the concurring opinion of Mr. Justice Harlan in Kingsley International Pictures Corp. v. Regents of the University of State of New York, 1959, 360 U.S. 684, 703, 79 S.Ct. 1362, 1373, 3 L. Ed.2d 1512, 1525.