Samuel BAILEY, Joseph Broadwater and Burnett L. Jacob, on behalf of themselves and others similarly situated, Plaintiffs,

v.

Joe T. PATTERSON, Attorney General of the State of Mississippi, et al., Defendants.

Civ. A. No. 3133.

United States District Court
S. D. Mississippi,
Jackson Division.

Nov. 17, 1961.

Rivés, Circuit Judge, dissented.

Constance Baker Motley and Derrick A. Bell, New York City, R. Jess Brown, Vicksburg, Miss., for plaintiffs.

Joe T. Patterson, Atty. Gen., Dugas Shands, Edward L. Cates, and Charles Clark, Assts. to the Atty. Gen., and P. M. Stockett, Jr., Sp. Asst. Atty. Gen., for Joe T. Patterson.

Thomas H. Watkins, Jackson, Miss., for City of Jackson.

J. A. Travis, Jr., City Pros. Atty., Robert G. Nichols, Jr., Asst. Pros. Atty., E. W. Stennett, City Atty., Jackson, Miss., for City of Jackson, Mayor, Commissioners and Chief of Police.

Robert C. Cannada and Junior O'Mara, Jackson, Miss., for Southern Greyhound Lines and Continental.

Sydney Smith, Jr., Jackson, Miss., for Illinois Cent. R. Co.

J. W. Young and James Young, Jackson, Miss., for Jackson City Lines.

Colin L. Stockdale, Jackson, Miss., for Cicero Carr.

Rubel L. Phillips, Jackson, Miss., for Jackson Airport Authority.

Before RIVES, Circuit Judge, and MIZE and CLAYTON, District Judges.

MIZE, District Judge.

The plaintiffs in this case are Samuel Bailey, Joseph Broadwater and Burnett L. Jacob, each of whom is an adult Negro citizen of the United States and the State of Mississippi, who filed their complaint herein on June 9, 1961. The defendants in the case as shown by the amended complaint are Joe T. Patterson, The City of Jackson, Allen C. Thompson, Douglas L. Luckey, W. D. Rayfield, Jackson Municipal Airport Authority, Continental Southern Lines, Inc., Southern Greyhound Lines, Illinois Central Railroad, Inc., Jackson City Lines, Inc., Cicero Carr. Each of the defendants has filed an answer to the amended complaint, setting out their defenses. The issues are clearly defined by these pleadings. The amended complaint was in substance a substitution of the original complaint.

It is the contention of the plaintiffs that Sections 2351, 2351.5, 2351.7, 7784, 7785, 7786, 7786-01, 7787, and 7787.5 of the Code of Mississippi of 1942 are unconstitutional; that the defendants are seeking to enforce these statutes; and that a preliminary injunction should be issued enjoining the defendants and each of them and their successors from enforcing any of these statutes or any other statutes requiring racial segregation on common carriers or in the facilities maintained by common carriers. Plaintiffs further contend that the defendant City of Jackson and its officials are enforcing an ordinance of the City of Jackson adopted January 12, 1956, and contend that this ordinance of the City is unconstitutional on its face, but that notwithstanding its unconstitutionality, the defendants, City of Jackson and its officials, have threatened to enforce this ordinance against the plaintiffs and members of their class. Plaintiffs further contend that the defendants and each of them, acting under color of the laws of the State of Mississippi and under color of Sections 2087.5, 2087.7 and 2089.5 of Mississippi Code of 1942, have pursued and will continue to pursue a policy and custom of segregation of Negro and white persons on common carriers in the State of Mississippi unless restrained, and they contend further that they have no other speedy or adequate remedy at law other than by injunction. Plaintiffs pray for the organization of a three-judge court as required by Title 28 U.S.

C. § 2284, and pray for the issuance of a preliminary and permanent injunction enjoining each of the defendants from enforcing or attempting to enforce any of the aforementioned statutes or any other statute of the State of Mississippi requiring segregation; pray for an injunction enjoining the City of Jackson or any of its officers from enforcing any of the ordinances of the City of Jackson hereinabove referred to; to enjoin the defendants and each of them from continuing to enforce any policy or custom under color of State law or City ordinances of segregating Negro and white passengers on common carriers or in facilities maintained by any common carrier, from continuing to enforce any policy or custom of segregating the races in the facilities and services of the Jackson Municipal Airport or its restaurant operated by Cicero Carr, and from continuing to arrest, intimidate or threaten to arrest members of their class in connection with the exercise of their Federally protected right to use inter and intra state transportation and services without segregation or discrimination because of their race.

The defendants and each of them in their answers deny that they are enforcing or attempting to enforce any of the statutes against the plaintiffs or any of their class because of their race. Defendants contend that this is the type of action wherein the Federal Court should abstain from passing on these statutes until the State courts have first had an opportunity to pass on its own laws and city ordinances.

All the defendants contend that no injunction should issue against either of the defendants. More specifically, the defendant Joe T. Patterson contends that this is not properly a class action; that the amended complaint raises factual and legal controversy involving unsettled questions of state law which should properly be decided first by the Supreme Court of Mississippi in order to avoid unnecessarily deciding constitutional questions, and that there is a full and adequate procedure existing in the state tribunals of the state for the plaintiffs to assert all of their rights and privileges claimed by this suit; and that none of the laws of the State of Mississippi that are complained of in the amended complaint have ever been presented to the highest tribunal or any other court of the State of Mississippi for adjudication. The Attorney General further contends that in effect this suit against the Attorney General in his official capacity is an action against the State of Mississippi, which, under the provisions of the Eleventh Amendment to the Constitution could not be maintained without its consent, and further, that the complaint attacks the enforcement of parts of the criminal laws of the State of Mississippi which have been passed in the sovereign capacity of the State for the purpose of protecting all persons of the state against domestic violence, and undertakes to prevent the enforcement of the ordinances of the City of Jackson and to prevent the State officials of Mississippi from enforcing Sections 2087.5, 2087.7 and 2089.5 of the Mississippi Code of 1942. (These statutes are set out in Appendix I) He contends that these statutes are constitutional and are not being unconstitutionally enforced. He further contends that this action constitutes an attempt to control the law enforcemet officials of the City of Jackson, as well as the State of Mississippi in the exercise of their valid discretionary powers and authority.

The defendants, City of Jackson and Allen Thompson, its Mayor, the Commissioners and Chief of Police contend that the amended complaint raises primarily factual issues and that the primary issue raised by the amended complaint involves the arrest of the so-called Freedom Riders under Section 2087.5 et seq. of the Code of 1942 and that the arrest of the Freedom Riders was legitimate and in accord with these sections, and that these sections were not unconstitutionally enforced. They contend specifically that there was no effort to enforce segregation laws by the arrests, but simply to maintain law and order and to prevent breaches of the peace. They further con-

tend that this Court should abstain from passing on the constitutionality of these Acts until passed upon by the Supreme Court of Mississippi and contend, also, that the City of Jackson is an agency of the State of Mississippi and, therefore, not subject to suit.

The defendants, Continental Southern Lines, Inc., Southern Greyhound Lines, Illinois Central Railroad, Inc., Jackson City Lines, Inc., Jackson Municipal Airport Authority and Cicero Carr contend that they have not caused the arrest of anyone and that they are not seeking to enforce the segregation laws of the State of Mississippi, and contend that no injunction should issue against them, for the reason that the plaintiffs have a full, complete and adequate remedy at law to redress any grievances they may have.

Briefly, these are the main contentions of the respective parties as reflected by the pleadings in this case.

The majority of the Court has reached the conclusion that under the issues as raised by the pleadings in this case it is the duty of this court to abstain from passing on the issues, but retain the cause of action on its docket and remit the plaintiffs to the State Courts of Mississippi for a prior adjudication of the issues and of the scope and meaning of its own statutes as so defined. This Court should simply stay its hand until the adequate and proper remedies provided for by the statutes of the State of Missis-

sippi should be exhausted. By this procedure the comity existing between the Federal Courts and the State Courts would be maintained without any serious injury to anyone. With the exception of Sections 2351 and 7784 [1], the sections of the Mississippi Code complained of and the constitutionality of which is under attack herein have never been passed upon by the Supreme Court of Mississippi. These sections 2351, 2351.5, 2351.7, 7784, 7785, 7786, 7786-01, 7787, and 7787.5 of the Mississippi Code of 1942 as amended are set out in Appendix II to this opinion. Before this Court should pass upon the constitutionality of these statutes in this particular case, wherein it is shown by the contentions of the parties that there will be factual issues as well as the constitutionality of the statutes involved, the courts of the State of Mississippi should be afforded an opportunity to pass upon them.

This equitable principle of abstention is well supported by the decisions of the Supreme Court of the United States, as well as by many of the decisions of the various Courts of Appeal and District Courts. It will not be necessary to refer to all the decisions that have adhered to this doctrine, but the quotations from a few of the leading cases will be decisive. Probably the one most nearly in point is the case of Harrison, Attorney General of Virginia et al. v. National Association for the Advancement of Colored People et al., 360 U.S. 167, 79 S.Ct. 1025, 1030, 3 L.Ed.

---

1. The Mississippi Supreme Court in Louisville, N. O. & T. R. Co. v. State, 66 Miss. 662, 6 So. 203, 5 L.R.A. 132, held that the Mississippi Act of March 2, 1888, now Sections 2351 and 7784, Mississippi Code 1942, Recompiled, applied solely to commerce within the state and affirmed a conviction based on a violation of the Act. In affirming, the United States Supreme Court held, in Louisville, N. O. & T. R. Co. v. Mississippi, 1889, 133 U.S. 587, 10 S.Ct. 348, 33 L.Ed. 784, that a state may require railroads to provide separate accommodations for the white and colored races without violating the commerce clause of the Constitution so long as the statute applies only to commerce within the state.

In 1912, the Mississippi Supreme Court held, in Alabama & V. Ry. Co. v. Morris, 103 Miss. 511, 60 So. 11, that Sections 4059 and 1351, Mississippi Code 1906, now Sections 2351 and 7784, applied to interstate travelers and was a reasonable exercise of the police power of the state, and, in 1919, the Mississippi Supreme Court held that Section 4059, Mississippi Code 1906, now Section 7784, Mississippi Code 1942, Recompiled, did not violate either the commerce clause of, or the Fourteenth Amendment to, the federal Constitution. Illinois Central R. Co. v. Redmond, 119 Miss. 765, 81 So. 115.

2d 1152, in which it was held by the Supreme Court of the United States that the Federal Courts should not adjudicate the constitutionality of state enactments fairly open to interpretation until the State Courts have been afforded a reasonable opportunity to pass upon them. The Court said:

"According every consideration to the opinion of the majority below, we are nevertheless of the view that the District Court should have abstained from deciding the merits of the issues tendered it, so as to afford the Virginia courts a reasonable opportunity to construe the three statutes in question. * * *

"This now well-established procedure is aimed at the avoidance of unnecessary interference by the federal courts with proper and validly administered state concerns, a course so essential to the balanced working of our federal system. To minimize the possibility of such interference a 'scrupulous regard for the rightful independence of state governments * * * should at all times actuate the federal courts,' Matthews v. Rodgers, 284 U.S. 521, 525 [52 S.Ct. 217, 76 L.Ed. 447], as their 'contribution * * * in furthering the harmonious relation between state and federal authority * * *.' Railroad Comm. v. Pullman Co., 312 U.S. 496, 501 [61 S.Ct. 643, 85 L.Ed. 971]. In the service of this doctrine, which this Court has applied in many different contexts, no principle has found more consistent or clear expression than that the federal courts should not adjudicate the constitutionality of state enactments fairly open to interpretation until the state courts have been afforded a reasonable opportunity to pass upon them. See e. g., Railroad Comm. v. Pullman Co., supra; Chicago v. Fieldcrest Dairies, Inc., 316 U.S. 168 [62 S.Ct. 986, 86 L.Ed. 1355]; Spector Motor Service, Inc., v. McLaughlin, 323 U.S. 101 [65 S. Ct. 152, 89 L.Ed. 101]; American Federation of Labor v. Watson, 327 U.S. 582 [66 S.Ct. 761, 90 L.Ed. 873]; Shipman v. DuPre, 339 U.S. 321 [70 S.Ct. 640, 94 L. Ed. 877]; Albertson v. Millard, 345 U.S.

242 [73 S.Ct. 600, 97 L.Ed. 983]; Government & Civic Employees v. Windsor, 353 U.S. 364 [77 S.Ct. 838, 1 L.Ed.2d 894]. This principle does not, of course, involve the abdication of federal jurisdiction, but only the postponement of its exercise; it serves the policy of comity inherent in the doctrine of abstention; and it spares the federal courts of unnecessary constitutional adjudication. See Chicago v. Fieldcrest Dairies, Inc., supra, [316 U.S.] at pages 172–173 [62 S.Ct. at page 988].

"The present case, in our view, is one which calls for the application of this principle, since we are unable to agree that the terms of these three statutes leave no reasonable room for a construction by the Virginia courts which might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem."

The Court said, further: "We do not intimate the slightest view as to what effect any such determinations might have upon the validity of these statutes. All we hold is that these enactments should be exposed to state construction or limiting interpretation before the federal courts are asked to decide upon their constitutionality, so that federal judgment will be based on something that is a complete product of the State, the enactment as phrased by its legislature and as construed by its highest court."

Just as was said by the Supreme Court of the United States, supra, we do not in this case undertake to pass upon any of the issues that have been raised, nor do we intimate whether the statutes are constitutional or unconstitutional, for the reason that the courts of the State of Mississippi should be permitted to pass upon these questions, uninfluenced by any adjudication or intimation of ours as to the statutes. We have given careful consideration not only to the opinion of the majority of the Court in that case and the governing rule announced by it, but we also have considered the thinking of Mr. Justice Douglas, who dissented, in which

he was joined by the Chief Justice and Mr. Justice Brennan, whose opinion set out the history and doctrine, considering also the decisions cited in the dissenting opinion. However, as a general rule, every lawsuit must be determined by the issues raised in the pleadings in the particular case, and it is our view that in this particular case, where the constitutionality of the statutes of Mississippi is questioned and has never been passed upon by the highest court of the State, a sound discretion requires that the federal courts abstain. In the case of Spector Motor Co. v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 154, 89 L.Ed. 101, the Supreme Court used this language:

"If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality—here the distribution of the taxing power as between the State and the Nation—unless such adjudication is unavoidable. And so, as questions of federal constitutional power have become more and more intertwined with preliminary doubts about local law, we have insisted that federal courts do not decide questions of constitutionality on the basis of preliminary guesses regarding local law." (Citing authorities.)

In connection with Harrison v. N. A. A. C. P., supra, see the many authorities cited in the dissenting opinion of Judge Sterling Hutcheson, N. A. A. C. P. v. Patty, 159 Fed.Supp. 503, 535, with reference to abstention. In that exhaustive dissent he reviews at page 540, et seq., the many authorities upholding this doctrine of abstention.

We are in thorough accord with the opinion of the Court of the Fifth Circuit in the case of Empire Pictures Distributing Company, Inc. et al. v. City of Fort Worth et al., 273 F.2d 529, 531, in which the Court upheld the doctrine of abstention and quotes at length from many of the applicable authorities to that doctrine, and particularly applicable to the issues raised in the case here. In that case the Court said: "At the threshold of the case lies the question whether the trial court ought not sua sponte to have withheld action 'while the parties repair(ed) to a state tribunal for an authoritative declaration of applicable state law.'" The Court then, in a very able opinion, and exhaustive, cited the many authorities, quoting from a number of them to the effect that the trial courts should have abstained. We shall not quote at length from that opinion more than to say that we adopt it as announcing the controlling principles of the law governing us in abstention in this case. In the earlier case of Railroad Comm. of Texas et al. v. Pullman Company et al., 312 U.S. 496, 61 S.Ct. 643, 645, 85 L.Ed. 971, the Supreme Court of the United States said:

"Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies, whether the policy relates to the enforcement of the criminal law, Fenner v. Boykin, 271 U.S. 240 [46 S.Ct. 492, 70 L.Ed. 927]; Spielman Motor Co. v. Dodge, 295 U.S. 89 [55 S.Ct. 678, 79 L.Ed. 1322]; or the administration of a specialized scheme for liquidating embarrassed business enterprises, Pennsylvania v. Williams, 294 U. S. 176 [55 S.Ct. 380, 79 L.Ed. 841]; or the final authority of a state court to interpret doubtful regulatory laws of the state, Gilchrist v. Interborough Co., 279 U.S. 159 [49 S.Ct. 282, 73 L.Ed. 652]; cf. Hawks v. Hamill, 288 U.S. 52, 61 [53 S.Ct. 240, 77 L.Ed. 610]. These cases reflect a doctrine of abstention appropriate to our federal system whereby the federal courts, 'exercising a wise discretion,' restrain their authority because of 'scrupulous regard for the rightful independence of the state governments' and for the smooth working of the federal judiciary. See Cavanaugh v. Looney, 248 U.S. 453, 457 [39 S.Ct. 142, 63 L.Ed. 354]; Di Giovanni v. Camden Ins. Ass'n, 296 U.S. 64, 73 [36 S.Ct. 1, 80 L.Ed. 47]. This use of equitable powers is a contribution of the courts in furthering the harmonious relation between state and federal authority without the need of rigorous congressional restriction of those powers."

We think the above authorities and those cited below [2] along with those mentioned in the various opinions in the cases supra are ample to require that the federal court abstain.

Moreover, the doctrine of abstention is peculiarly applicable in this case because of the attack made upon Sections 2087.5, 2087.7 and 2089.5 of the Mississippi Code of 1942, generally known as the peace statutes. All the authorities hereinbefore cited are applicable to these statutes, but there are other authorities which we think are just as applicable and for that reason we are treating these separately. As shown by the pleadings, the plaintiffs are contending that the defendants are using these statutes to enforce segregation and the defendants are contending that these statutes are constitutional and are not being used to enforce segregation, but are being used for the purpose of protecting the public against violence and disturbance of the peace. This Court, in the case of Wykcoff, had an occasion to pass upon a petition for habeas corpus growing out of the arrest of one of the "Freedom Riders" in the City of Jackson, wherein it was contended by the petitioner in that case that this statute was being used to enforce segregation. Her petition for the writ of habeas corpus alleged that she was convicted of violation of Section 2087.5 of the Mississippi Code and that she did not have any remedy at law other than the writ of habeas corpus to secure her release, and that her imprisonment was a denial of her due process of law under the Fifth and Fourteenth Amendments to the Constitution of the United States. The respondent, the Sheriff of Hinds County, in answering the petition for the writ, averred that she was convicted in a court having jurisdiction and that he was holding the petitioner by virtue of a commitment from that court. The matter was heard before the Court of the Southern District of Mississippi and the writ denied. She immediately petitioned the Court of Appeals for the Fifth Circuit for an appeal in forma pauperis, that the petition be granted and the case advanced. The Court of Appeals denied the petition and since the opinion has not been published, a copy of the opinion rendered by the Court is attached hereto in Appendix III.

In the trial before the lower court it was contended by petitioner that she had no adequate remedy at law, which contention was not upheld, as it was shown that under the statutes of Mississippi particularly she did have a full, adequate and speedy remedy at law and these statutes are set out in the opinion of the District Court. Application of Wyckoff, 196 F. Supp. 515, 517. In that case the Court did retain jurisdiction, but since the petitioner did have adequate remedy at law, the writ was denied. In that opinion the Court said: "As heretofore stated, the Federal Courts are very reluctant indeed to interfere with the orderly process of a State Court involving state matters." And cited the cases of Davis v. Burke, 179 U.S. 399, 21 S.Ct. 210, 45 L.Ed. 249; Ex parte Hawk, 321 U.S. 114, 64 S.Ct. 448, 88 L.Ed. 572; Stack v. Boyle, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3; Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469.

It is true that upon an application for a writ of habeas corpus there is a federal statute which prohibits the federal courts from interfering with the state courts, except in those cases specifically authorized by Congress. However, the principle involved is the same, since it is the general doctrine that the federal courts should not lend their equitable powers and injunctive powers until the state courts first have passed upon the constitutionality of its own acts. Section 2283,

2. Martin v. Creasy, 360 U.S. 219, 79 S.Ct. 1034, 3 L.Ed.2d 1186; County of Allegheny v. Frank Mashuda Co. et al., 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163; Watson v. Buck, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416; Callaway v. Benton, 336 U.S. 132, 142, 69 S.Ct. 435, 93 L.Ed.

553; Government and Civic Employees Organization of C. I. O. v. Windsor, 353 U.S. 664, 77 S.Ct. 838, 1 L.Ed.2d 894; Two Guys from Harrison—Allentown v. McGinley, 366 U.S. 582, 589, 81 S.Ct. 1135, 6 L.Ed.2d 551.

Title 28 U.S.C.A. prohibits a court of the United States from granting an injunction to stay proceedings in a state court except as expressly authorized by the Act of Congress, or when necessary in aid of its jurisdiction, or to protect and effectuate its judgments. In view of that statute the writ of habeas corpus was denied in the Wyckoff case, and citing in support thereof; Empire Pictures Distributing Co. v. City of Fort Worth, 5 Cir., 273 F.2d 529; Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324.

At pages 163–164 of the City of Jeannette case in 319 U.S., at page 880 of 63 S.Ct., supra, the Supreme Court of the United States said:

"The power reserved to the states under the Constitution to provide for the determination of controversies in their courts may be restricted by federal district courts only in obedience to Congressional legislation in conformity to the Judiciary Article of the Constitution. Congress, by its legislation, has adopted the policy, with certain well defined statutory exceptions, of leaving generally to the state courts the trial of criminal cases arising under state laws subject to review by this Court of any federal questions involved. * * *

" * * * No person is immune from prosecution in good faith for his alleged criminal acts. Its imminence, even though alleged to be in violation of constitutional guaranties, is not a ground for equity relief since the lawfulness or constitutionality of the statute or ordinance on which the prosecution is based may be determined as readily in the criminal case as in a suit for injunction. * * * Where the threatened prosecution is by state officers for alleged violations of a state law, the state courts are the final arbiters of its meaning and application, subject only to review by this Court on federal grounds appropriately asserted.

Hence the arrest by the federal courts of the processes of the criminal law within the states, and the determination of questions of criminal liability under state law by a federal court of equity, are to be supported only on a showing of danger of irreparable injury 'both great and immediate.' * * *

" * * * It does not appear from the record that petitioners have been threatened with any injury other than that incidental to every criminal proceeding brought lawfully and in good faith, or that a federal court of equity by withdrawing the determination of guilt from the state courts could rightly afford petitioners any protection which they could not secure by prompt trial and appeal pursued to this Court."

The principles announced in the Jeannette case have been reaffirmed on the basis of that case and the Stefanelli case, Stefanelli v. Minard, 342 U.S. 117, 123–124, 72 S.Ct. 118, 96 L.Ed. 138, in two Supreme Court cases decided this year: Wilson v. Schnettler et al., 365 U.S. 381, 81 S.Ct. 632, 5 L.Ed.2d 620, and Pugach v. Dollinger, 365 U.S. 458, 81 S.Ct. 650, 5 L.Ed.2d 678. These cases are discussed more at length in the Wyckoff case, 196 F. Supp. 522–523.

The whole question of State-Federal relationships and their history is discussed in a recent decision of the Court of Appeals for the Fifth Circuit in Smith & Son, Inc. v. Williams, 275 F.2d 396. Beginning on page 402 will be found a large number of cases applicable to the questions before us.

Statutes generally known as peace statutes exist in most of the States of the Union and have been applied under a variety of circumstances in recent times. They have been used by the officers of the States and subdivisions thereof to prevent violence and more serious offenses where people have gathered, or are threatening to gather in numbers under pressure of emotional stress. The public press carried an account recently

of a congregation of a large number of white people when Negroes sought to make use of bathing beaches at or near Chicago. It was stated that the state officers made use of loud speakers to order the crowd to leave the scene or be subject to imprisonment under state laws. It was not hinted that those who had collected did not have the full right to be where they were. Acting under state peace statutes, the officers simply required them to move on, because in their judgment their presence was likely to lead to a breach of the peace. The scope and reach of such statutes varies from state to state, and their application to a given situation makes a peculiar call on the judgment of state tribunals before such application should be tested in a court of the United States.

The situation disclosed by the facts in this record fall, in our opinion, directly within the scope of the decisions of the Supreme Court requiring abstention until the State courts have decided the full meaning of their respective statutes and their application to the situations which are presented to us.

The record before us shows the pendency of a number of proceedings before the State Courts of Mississippi under the peace statutes, and the class for which the plaintiffs here purport to act is already participating in state court proceedings where all of the questions raised before us may be fully presented with the right of appeal to the Supreme Court of the United States.

An order will be entered, therefore, abstaining from further action in this cause to give the State Courts of Mississippi a reasonable opportunity to act either in the cases already pending or in any new case which any of the parties may elect to commence.

### APPENDIX I

##### Statutes Involved

*Mississippi Code of 1942*

§ 2087.5—"1. Whoever with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby:

"(1) crowds or congregates with others in or upon shore protecting structure or structures, or a public street or public highway, or upon a public sidewalk, or any other public place, or in any hotel, motel, store, restaurant, lunch counter, cafeteria, sandwich shop, motion picture theatre, drive-in, beauty parlor, swimming pool area, or any sports or recreational area or place, or any other place of business engaged in selling or serving members of the public, or in or around any free entrance to any such place of business or public building, or to any building owned by another individual, or a corporation, or a partnership or an association, and who fails or refuses to disperse and move on, or disperse or move on, when ordered so to do by any law enforcement officer of any municipality, or county, in which such act or acts are committed, or by any law enforcement officer of the State of Mississippi, or any other authorized person, or

"(2) insults or makes rude or obscene remarks or gestures, or uses profane language, or physical acts, or indecent proposals to or toward another or others, or disturbs or obstructs or interferes with another or others, or

"(3) while in or on any public bus, taxicab, or other vehicle engaged in transporting members of the public for a fare or charge, causes a disturbance or does or says, respectively, any of the matters or things mentioned in subsection (2) supra, to, toward, or in the presence of any other passenger on said vehicle, or any person outside of said vehicle or in the process of boarding or departing from said vehicle, or any employee engaged in and about the operation of such vehicle, or

"(4) refusing to leave the premises of another when requested so to do by any owner, lessee, or any employee thereof,

"shall be guilty of disorderly conduct, which is made a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not more than two hundred dol-

lars ($200.00), or imprisonment in the county jail for not more than four (4) months, or by both such fine and imprisonment; and if any person shall be guilty of disorderly conduct as defined herein and such conduct shall lead to a breach of the peace or incite a riot in any of the places herein named, and as a result of said breach of the peace or riot another person or persons shall be maimed, killed or injured, then the person guilty of such disorderly conduct as defined herein shall be guilty of a felony, and upon conviction such person shall be imprisoned in the Penitentiary not longer than ten (10) years.

"2. The provisions of this act are supplementary to the provisions of any other statute of this state.

"3. If any paragraph, sentence, or clause of this act shall be held to be unconstitutional or invalid, the same shall not affect any other part, portion or provision of this act, but such other part shall remain in full force and effect." Source: Laws of 1960, c. 250.

§ 2087.7—"1. It shall be unlawful for any person or persons, while in or on the premises of another, whether that of an individual person, or a corporation, or a partnership, or an association, and on which property any store, restaurant, sandwich shop, hotel, motel, lunch counter, bowling alley, moving picture theatre or drive-in theatre, barber shop or beauty shop, or any other lawful business is operated which engaged in selling articles of merchandise or services or accommodation to members of the public, or engages generally in business transactions with members of the public, to:

"(1) prevent or seek to prevent, or interfere with, the owner or operator of such place of business, or his agents or employees, serving or selling food and drink, or either, or rendering service or accommodation, or selling to or showing merchandise to, or otherwise pursuing his lawful occupation or business with, customers or prospective customers, or other members of the public who may then be in such building, or

"(2) prevent or seek to prevent, or interfere with, or seek to interfere with, other persons, expressly or impliedly invited upon said premises, or prospective customers, coming into or frequenting such premises in the normal course of the operation of the business conducted and carried on upon said premises,

"shall be guilty of disorderly conduct, a misdemeanor, and upon conviction thereof, shall be punished by a fine of not more than five hundred dollars ($500.00), or by imprisonment in the county jail for not more than six (6) months, or by both such fine and imprisonment.

"2. The provisions of this act are supplementary to the provisions of any other statute of this state.

"3. If any paragraph, sentence, or clause of this act shall be held to be unconstitutional, or invalid, the same shall not affect any other part, portion or provision thereof, but such other part shall remain in full force and effect." Source: Laws of 1960, c. 260.

§ 2089.5—"1. Any person who disturbs the public peace, or the peace of others, by violent, or loud, or insulting, or profane, or indecent, or offensive, or boisterous conduct or language, or by intimidation, or seeking to intimidate any other person or persons, or by conduct either calculated to provoke a breach of the peace, or by conduct which may lead to a breach of the peace, or by any other act, shall be guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine of not more than five hundred dollars ($500.00), or by imprisonment in the county jail not more than six (6) months, or both.

"2. The provisions of this act are supplementary to the provisions of any other statute of this state.

"3. If any paragraph, sentence or clause of this act shall be held to be unconstitutional or invalid, the same shall not affect any other part, portion or provision thereof, but such other part shall remain in full force and effect." Source: Laws of 1960, c. 254.

## APPENDIX II

### Statutes Involved

#### *Mississippi Code of 1942*

§ 2351—"If any person or corporation operating a railroad shall fail to provide two or more passenger cars for each passenger train, or to divide the passenger cars by a partition, to secure separate accommodations for the white and colored races, as provided by law, or if any railroad passenger conductor shall fail to assign each passenger to the car or compartment of the car used for the race to which the passenger belongs, he or it shall be guilty of a misdemeanor, and, on conviction shall be fined not less than twenty dollars nor more than five hundred dollars." Source: Code of 1892, § 1276.

§ 2351.5—"Every railroad company, bus company or other common carrier for hire owning, maintaining or operating a passenger depot, bus station or terminal where a waiting room for passengers is maintained and operated shall cause to be constructed and maintained in connection with such reception or waiting room two closets or retiring or rest rooms to be exclusively used by white passengers in intrastate commerce arriving and departing from such depot, bus station or terminal and the following notice shall be painted or shown in bold letters on the door of one: 'Rest room, white female only in intrastate travel,' and on the other: 'Rest room, white male only in intrastate travel;' and likewise two closets or retiring or rest rooms shall be constructed and maintained for colored passengers in intrastate travel with like signs painted or shown in bold letters on the doors thereof, substituting the word 'colored' for 'white,' and such owner or operator shall see that the closets or rest rooms are equally clean and in equally good sanitary condition.

"No white person shall enter, frequent, occupy or use the colored closets or rest rooms required by this act, and no colored person shall enter, frequent, occupy or use the white closets or rest rooms required by this act, except, however, regularly employed persons of the owner or operator of the passenger depots, bus stations or terminals may enter such closets or rest rooms in the discharge of their assigned duties.

"Any person violating the provisions of this act shall be guilty of a misdemeanor and upon conviction thereof shall be fined not more than one thousand dollars ($1,000.00) or confined in jail for not more than one year, or both." Source: Laws of 1956, c. 259.

§ 2351.7—"1. Any person traveling in intrastate travel by rail, bus, airline or other common carrier for hire who knowingly or wilfully enters or attempts to enter the waiting room not marked and provided for persons other than his or her race as required by law, shall be guilty of a misdemeanor and upon conviction thereof shall be fined not more than one thousand dollars ($1,000.00) and imprisoned in jail not more than sixty (60) days, or both such fine and imprisonment.

"2. No white person shall enter, frequent, occupy or use the colored waiting room of any depot, bus station or terminal when such waiting room is marked in bold letters as required by law; and no colored person shall enter, frequent, occupy or use the white waiting room of any depot, bus station or terminal when same is marked in bold letters as required by law, except, however, regularly employed persons of the owner or operator of depots, bus stations or terminals may enter same in the discharge of their assigned and required duties.

"Any person violating the provisions of this section shall be guilty of a misdemeanor and upon conviction thereof shall be fined not more than one thousand dollars ($1,000.00) and imprisoned in jail for not more than one year, or both.

"3. No action or suit in law or in equity may be brought in any court of this state against any law enforcement officer for damages for false arrest of any passenger because of a violation of this act, nor shall any common carrier of passengers, or its employees be subject to suit for damages on account of such com-

mon carrier of passengers or its employees complying with the provisions of this act.

"4. In the event any part or parts of this act shall be held unconstitutional, the remaining portion of this act shall remain in full force and effect." Source: Laws of 1956, c. 260.

§ 7784—"Every railroad carrying passengers in this state shall provide equal but separate accommodations for the white and colored races by providing two or more passenger cars for each passenger train, or by dividing the passenger cars by a partition to secure separate accommodations; and the conductor of such passenger train shall have power, and is required, to assign each passenger to the car, or the compartment of a car, used for the race to which such passenger belongs; and should any passenger refuse to occupy the car to which he or she is assigned by the conductor, the conductor shall have power to refuse to carry such passenger on the train, and for such refusal neither he nor the railroad company shall be liable for damages in any court." Source: Code of 1892, § 3562.

§ 7785—"All persons or corporations operating street railways and street or municipal buses, carrying passengers in this state, and every common carrier by motor vehicle of passengers in this state as defined by section 3(e) of chapter 142 of the laws of 1938 (§ 7634, Code of 1942), shall provide equal, but separate, accommodations for the white and colored races.

"Every common carrier by motor vehicle of passengers in this state, as defined by section 3(e) of chapter 142 of the laws of 1938 (§ 7634, Code of 1942), by buses or street cars operated entirely within the corporate limits of a municipality, or within a radius of 5 miles thereof, shall divide its passengers by the use of an appropriate sign 4 x 9 inches, for the purpose of, and in a manner that will 'suitably provide for, a separation of the races, and all other buses and motor vehicles carrying passengers for hire in the state of Mississippi shall use a latticed movable partition extending from the top of the seat to the ceiling of the vehicle, said partition not to obstruct the view of the driver of the vehicle to secure such separate accommodations; provided, however, that this act shall not apply to buses operated exclusively for the carrying of military personnel; and the operators of such passenger buses shall have power, and are required, to assign each passenger to the compartment of the bus used for the race to which such passenger belongs; and in no case shall any passenger be permitted to stand in the aisle of the compartment in which he does not belong and is not so assigned; and should any passenger refuse to occupy the compartment to which he or she belongs and is assigned, the operator shall have power to refuse to carry such passenger on the bus; or should either compartment become so loaded in transit as not to permit the taking on of any further passengers for that compartment, then the bus operator shall not be required and shall refuse to take on any further passengers in violation of this act. Even though such additional passengers may have purchased and may hold tickets for transportation on the said bus, the only remedy said passengers shall have for failure or refusal to carry them under such circumstances is the right to a refund of the cost of his ticket, and for said refusal in either case neither the operator nor the common carrier shall be liable for damages in any court. Such partition may be made movable so as to allow adjustment of the space in the bus to suit the requirements of traffic." Source: Code of 1906, § 4060.

§ 7786—"The operators of such street cars and street buses and motor vehicles, as defined by chapter 142 of the laws of 1938 (§§ 7632–7687, Code of 1942) shall have power and are required to assign each passenger to the space or compartment used for the race to which such passenger belongs.

"Any passenger undertaking or attempting to go into the space or compartment to which by race he or she does not belong shall be guilty of a misdemeanor,

and upon conviction, shall be liable to a fine of twenty-five dollars ($25.00), or, in lieu thereof, by imprisonment for a period of not more than thirty (30) days in the county jail; and any operator of any street car or street bus or motor vehicle as herein defined, assigning or placing a passenger to the space or compartment other than the one set aside for the race to which said passenger belongs shall be guilty of a misdemeanor and, upon conviction, shall be liable to a fine of twenty-five dollars ($25.00), or, in lieu thereof, to imprisonment for a period of not more than thirty (30) days in the county jail." Source: Code of 1906, § 4061.

§ 7786.01—"Every person or corporation operating street railways and street or municipal buses, carrying passengers in this state, and every common carrier of passengers in this state by motor vehicle, as defined by section 3(e) of chapter 142 of the laws of 1938 (§ 7634, Code of 1942), guilty of wilful and continued failure to observe or comply with the provisions of this act shall be liable to a fine of twenty-five dollars ($25.00) for each offense, and each day's violation of the provision hereof shall constitute a separate violation of this act; provided, however, that in the case of persons or corporations operating street railways and street or municipal buses, the fine shall be ten dollars ($10.00) instead of twenty-five ($25.00). Source: Laws of 1944, c. 267.

§ 7787—"All officers and directors of street railway companies who shall refuse or neglect to comply with the provisions and requirements of the two preceding sections shall be deemed guilty of a misdemeanor, on conviction shall be fined not less than one hundred dollars or be imprisoned in the county jail not less than sixty days, and not more than six months, and any conductor or other employee of such street car company having charge of the same, who shall refuse or neglect to carry out the provisions of this chapter shall, on conviction, be fined not less than twenty-five dollars or be imprisoned in the county jail for not less than ten days nor more than thirty days for each and

every offense; provided, that nothing herein contained shall be construed as applying to nurses attending children of the other race." Source: Code of 1906, § 4062.

§ 7787.5—"1. In all passenger depots, bus stations or terminals owned, operated or leased in the State of Mississippi by a railroad company, bus company or any other common carrier of passengers, the owner or operator thereof shall cause to be constructed and maintained waiting or reception rooms as will secure the comfort of the passengers.

"In such depots, bus stations or terminals there shall be constructed, provided and maintained for the white intrastate passengers a separate waiting or reception room, on each entrance to which shall be painted or shown in bold letters the following:—'White waiting room, intrastate passengers'; and in such depot, bus station or terminal there shall be constructed, provided and maintained a separate waiting or reception room for the color intrastate passengers, on each entrance to which shall be painted or shown in bold letters the following:—'Colored waiting room, intrastate passengers.'

"2. Any common carrier of passengers for hire or any railroad or bus company, whether an individual or corporation, which fails or refuses to comply with the provisions of this act shall be liable in the penal sum of one thousand dollars ($1,000.00) per day for each day of such failure or refusal, to be recovered by suit filed in the county in which such depot, bus station or terminal is situated, by either the attorney general, the district attorney of the district, or the county attorney of the county in which said passenger depot, bus station or terminal is situated, and such suit shall be brought in the circuit court of the county in which said passenger depot, bus station or terminal is situated.

"In addition to the penalty provided herein, the Attorney General of the State of Mississippi or the district attorney of the district, or county attorney in the county in which said depot, bus station

or terminal is situated may file suit in the chancery court of such county for a mandatory injunction to compel compliance with the provisions of this act, and the chancery court of any county wherein the provisions of this act are not complied with shall have jurisdiction to issue an injunction to require compliance with this act, and to hold in contempt of court any railroad company, bus company or any other common carrier of passengers failing to comply with the orders and decrees of the court directing compliance with this act.

"3. The requirements of this act shall not be applicable to any person, firm or corporation operating a place of business wherein said person, firm or corporation acts only as ticket agent for a bus company or other common carrier in addition to his regular business and wherein no passenger waiting room or reception room is maintained." Source: Laws of 1956, c. 258.

## APPENDIX III

### In the United States Court of Appeals for the Fifth Circuit

In the Matter of:

ELIZABETH PORTER WYCKOFF
For a Writ of Habeas Corpus

Before TUTTLE, Chief Judge, and JONES and WISDOM, Circuit Judges.

BY THE COURT.

The petitioner herein seeks an order authorizing her to appeal from an order entered July 6, 1961, entered by the United States District Court for the Southern District of Mississippi, and moves for permission to proceed on her appeal upon the original papers filed in said District Court. Petitioner further moves for an immediate hearing of said appeal.

Petitioner asserts that she was arrested "for entering the white waiting room at the Continental Bus Terminal, Jackson, Mississippi, in the company of other interstate passengers of the Negro race, was sentenced on June 5, 1961, to two months imprisonment in the Hinds County jail, suspended, and a fine of $200 for violating Section 2087.5, Mississippi Code of 1942, As amended."

Petitioner asserts that because of the short term of her detention, and "the clear violation by respondent of the constitution and laws of the United States, the requirements that she must first exhaust her state remedies would, in effect, deny her the right of habeas corpus, in a situation where it was the sole effective remedy with which to safeguard her statutory and constitutional rights and liberties."

It no where appears in the petition that the petitioner has attempted to exhaust remedies available to her in the courts of the state of Mississippi, or that there is either an absence of available state remedies or that other circumstances exist which render such state remedies ineffective to protect the rights of the prisoner.

The jurisdiction of a federal court is fixed by the Acts of Congress. 28 U.S.C.A. § 2254, provides as follows:

"§ 2254. State custody; remedies in State courts. An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

"An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."

It not appearing from anything asserted in the petition in this case that petitioner sought to appeal her conviction, which she alleges to have been void and unconstitutional, or that she is financially unable to make bond pending such appeal, and it not appearing that petitioner has

no right to test her detention by habeas corpus in the state courts of Mississippi, there appears to be no sound reason for this Court to grant petitioner's motion for expediting the hearing in this Court. There thus appears to be no sound reason for granting petitioner's motion for permission to appeal upon the original papers, since no allegations are contained in the petition asserting petitioner's financial inability to cause the record to be prepared in accordance with the rules of this Court.

The motions are, therefore, denied.

RIVES, Circuit Judge (dissenting).

The complaint seeks to enjoin state-imposed racial segregation in public travel facilities in the State of Mississippi and the City of Jackson, Mississippi. It seeks relief against two types of statutes and ordinances: (1) laws which on their face require the segregation of the races, and (2) laws which purport to deal with the maintenance of law and order but which, according to the complaint, are used to maintain segregation.

The plaintiffs are three adult Negro citizens residing in Jackson, Mississippi, who sue on behalf of themselves and of other Negroes similarly situated and affected by the statutes and ordinances complained of.[1] The defendants are the Attorney General of Mississippi; the City of Jackson, its Mayor, Commissioners and Chief of Police; Jackson Municipal Airport Authority; Continental Southern Lines, Inc.; Southern Greyhound Lines; Illinois Central Railroad, Inc.; Jackson City Lines, Inc.; and Cicero Carr d/b/a Cicero's Airport Restaurant.

The original complaint and motion for preliminary injunction were filed on June 9, 1961. A hearing on the plaintiffs' motion for preliminary injunction was set for July 10, 1961. That hearing was continued because of the illness of an Assistant Attorney General of Mississippi. The hearing was reset for August 7, 1961.

Meanwhile, an Amended Complaint was filed on July 17, 1961. The hearing set for August 7, 1961 was confined to the argument of motions to dismiss, motions to dissolve the three-judge court, motions to abstain, motions for more definite statements, motions to require the plaintiffs to furnish security for costs, and to the plaintiffs' insistence upon a hearing of their motion for preliminary injunction. By order entered on that date, August 7, 1961, the court allowed the Amended Complaint which had been filed July 17, 1961; allowed the plaintiffs to join as an additional party defendant the Jackson Municipal Airport Authority; provided for service upon that party and for the filing of any motions and answers on its behalf; denied the motions to dismiss for lack of indispensable parties; denied, on conditions immediately met, the motions for more definite statements and the motions to require the plaintiffs to furnish security for costs; and carried with the case for later disposition the other motions to dismiss, the motions to dissolve the three-judge court, and the motions to abstain.

Over the plaintiffs' objection, their request to be heard on their motion for preliminary injunction was denied "in view of the broadening of the issues[2] by the Amended Complaint filed on July 17, 1961, and of the bringing in on this date of a new party defendant," and the hearing of the motion for preliminary injunction was passed until September 25, 1961. It was further ordered that on that date the

---

1. According to the complaint, "the class is composed of Negro citizens and residents of the State of Mississippi and other states who utilize the facilities and services of the defendant carriers located in the City of Jackson, and located in other cities of the State of Mississippi, and who travel in both intrastate and interstate commerce."

2. Paragraph 15 of the complaint was amended so as to make specific reference to the disorderly conduct and breach of the peace statutes, Secs. 2087.5, 2087.7 and 2089.5 of the Mississippi Code Annotated (1942), as among those under color of which the defendants pursued a policy, practice, custom and usage of segregating Negro and white passengers.

court would hear the case, both on said motion and on the prayer for permanent relief. The court stated its intention finally to dispose of the case following the hearing set for September 25, 1961.

On September 25, 1961, over certain objections noted in the transcript of testimony, the court did proceed with the hearing of the case both on the motion for preliminary injunction and on the prayer for permanent relief. The taking of testimony consumed three days—Monday, Tuesday and Wednesday, September 25, 26 and 27. On Thursday, September 28, oral arguments of counsel were heard, and a further exhibit of the plaintiffs (No. 36) was received. The defendant Greyhound Corporation was permitted to take the deposition of A. W. Wilson, which was filed on October 10, 1961. The testimony has now been transcribed and was filed on October 20, 1961, and additional briefs have been filed by the parties and by the amicus curiae, the United States of America.

The evidentiary disputes are not very material. The formal allegations of the complaint, the identity and residence of the plaintiffs, their use of the transportation facilities in question, the identification of the carrier defendants, their use of the busses, cars, terminals, depots, rest rooms, drinking fountains, etc., were all either admitted or established by undisputed evidence. Continental Southern and Greyhound admitted that in their Jackson terminals or depots there are signs on the outside doors of one waiting room which read: "Colored Waiting Room—Intrastate Passengers," and signs on the outside doors of another waiting room which read: "White Waiting Room —Intrastate Passengers," and on the sidewalks outside the respective waiting rooms are signs which read: "Waiting Room for Colored Only—by Order Police Dept." and "Waiting Room for White Only—by Order Police Dept." Each bus company claimed that it did not place the signs on the sidewalks, and that the signs on or over the doors were placed "pursuant to the provisions of Chapter 258, Laws of 1956, Regular Session of Mississippi Legislature." The bus companies further admitted that similar signs on or over the doors appear on waiting rooms in all terminals or depots in the State of Mississippi.

Illinois Central admitted that in its railroad terminal or depot in Jackson it maintains two separate waiting rooms, on the sidewalk outside of one of which are signs reading respectively: "Waiting Room for Colored Only, by Order Police Dept." and "Waiting Room for White Only, by Order Police Dept.," and that similar signs are located in the railroad terminal at the bottom of the stairs leading from the trains.

The Chief of Police of Jackson in his testimony admitted that the signs on the sidewalk were placed by the Police Department pursuant to the City segregation ordinance.

Both the two Bus Companies and the Railroad denied enforcing segregation on busses or cars.

The Jackson City Lines admitted that, pursuant to State law, it maintains signs on its busses directing that Negroes and whites sit in separate parts, and that, when those directions are not observed and a "breach of the peace is imminent," it has a policy of stopping the bus and proceeding no further.

The Jackson Municipal Airport Authority admitted segregation of the rest rooms and drinking fountains in its waiting rooms. Cicero Carr, the lessee of the restaurant at the Airport, admitted that he would not serve Negroes in the main dining room, but would serve them on a back counter in a room partially used for storage.

The Mayor of the City of Jackson, the chief law enforcement official of the City, and the State Attorney General were questioned on their racial policy with respect to public transportation facilities. The majority ruled that such testimony was inadmissible, and I dissented. The testimony was admitted under Rule 43 (c) of the Federal Rules of Civil Procedure, 28 U.S.C. as a specific offer of evidence. The statement of the Mayor is

so pertinent it should be quoted at length. (The ordinance under discussion in his testimony is the City ordinance requiring the segregation of transportation facilities.)

"Q. * * * State your understanding of the racial policy of the City of Jackson with respect to transportation facilities in the City of Jackson. A. * * * It has been the policy of mine as chief law enforcement officer, and the members of the city council and the police department and of the people of Jackson, to maintain what has worked over the last hundred years to bring happiness and peace and prosperity to everyone within our city. That has been done by a separation of the races, not segregation. We never refer to it as segregation. Now, of course, you know and I know the State law upon which the City ordinance was patterned in 1956, with the preamble put in as ours, showing why—to maintain peace and order and to keep down disturbances. Since I have been Mayor I do not recall one incident where there has been an arrest under this ordinance or any segregation ordinance. We have at all times tried to maintain peace and keep down disturbances. That is the policy. Our policy calls for a great deal of give and take. It is agreeable to both the white and the colored. * * * So you see that laws can come and laws can go and laws can be changed, but the policy adopted here is to maintain happiness and contentment between the races, within the law, and at the same time giving the benefit of the great advantage over the years of living together in peace and quiet.

"Q. Does this ordinance accurately reflect this policy, in effect, which you have just stated? * * * A. I think so * * *. However, as Your Honors have read it, you read the last paragraph there, it says, 'The Council of the said City of Jackson owes the duty to its citizens, regardless of race, color, creed or station in life, to maintain good order and to prevent breaches of the peace, and thereby to promote the health and general welfare of all its citizens,' and then of course we adopted the State ordinance in this. * * *

"Q. * * * Does the body of the ordinance, apart from the preamble, reflect the policy of the City of Jackson as you have stated it? A. The policy of the City of Jackson is certainly adopted in the ordinance, which is based on State law, that is taken from State law, and is based on exactly what I have said, the matter of separation of the races."

The State Attorney General testified on direct examination that it was his duty to enforce all of the laws in the State. He was extremely evasive on answering whether the State segregation laws affected his duty as Attorney General; however, he did say that they were laws of the State, that they had not been declared unconstitutional, and that he would enforce them "if conditions arise to such a point that I thought it was necessary to bring them into effect." He said in a concluding statement:

"My sole purpose since the beginning of these instigated troubles that were instigated outside our State and brought to our State, has been the preservation of peace and order within the borders of the State of Mississippi. I have undertaken that, along with all other public officials and law enforcement officers of this State."

Part of such undertakings were meetings prior to and just after the arrival of the first group of Freedom Riders on May 24, 1961, attended by himself, the Mayor and Chief of Police of Jackson. Plans were discussed at these meetings for dealing with the Freedom Riders. On this point he testified:

"Q. Did you discuss with the Chief of Police what steps he was

going to take to preserve law and order? A. Yes, we discussed plans.

"Q. What were those plans? A. The plan was to do exactly what they did, first of all to keep down riot and disorder, and these arrests necessarily followed. They could have been easily avoided had your clients only wanted them avoided * * *."

The Attorney General is not responsible for the enforcement of state law in the local courts; he is, nevertheless, the chief policymaker of state law enforcement.

The plaintiffs offered evidence of the arrests for breach of the peace of passengers on the defendant carriers. There is evidence of two incidents on the busses of the Jackson City Lines. (In fact, the records of the City Lines contain reports on only two incidents.) Plaintiff Bailey testified to the arrest of one Charles Patterson, a Negro, for refusing to move when a white man got on the bus and sat down next to him. Witness Doris Grayson testified to the arrest of herself and three companions who got on a City Lines bus in the center of the City and sat in a front seat. The bus was stopped for 10 minutes before a policeman came along. In neither instance is there any evidence in the record of an actual or threatened breach of the peace. The driver in the Grayson incident testified:

"Q. Were there any white persons on the bus? A. Yes.

"Q. At the time these four Negroes were on the bus? A. Yes.

"Q. Was there any disturbance on the bus? A. Not a bit.

"Q. Was there any disturbance outside the bus? A. No, not any."

The record also includes evidence on the arrests of approximately 300 Freedom Riders in the terminals of the defendant interstate carriers. Captain Ray of the Jackson Police Department, who personally made the majority, if not all, of the arrests, testified as follows with respect to the activities of the Negroes arrested in the white waiting room of the Illinois Central Railroad:

"Q. What were the Negroes doing that you arrested in there? * * A. They came in the terminal.

"Q. What did they do? A. They came in and some of them had seats and some of them stood.

"Q. What else did they do? A. That is about all.

"Q. Were they armed? A. I never found any of them armed.

"Q. Were they loud? A. No.

"Q. Did they use any curse words? A. No.

"Q. Did they strike anybody? A. No.

"Q. Did they threaten anybody? A. No.

"Q. Did you arrest them? A. I sure did.

"Q. For what? A. Because their presence provoked people and caused them to become disturbed, and I felt it best to maintain law and order and to order them to leave there. When they refused to obey my order, they were arrested.

"Q. Would you explain what you mean by 'their presence there provoked people'? A. Well, as I stated earlier, we had advance notice that they were coming to Jackson to create an incident similar to what has happened in other cities, and my duty there was to maintain law and order, and I felt it best to get the root of the trouble out of there, and that is when I ordered them to leave.

"Q. What did they do in violation of law and order? A. When I ordered them to leave, they just stood there, as though they hadn't heard me say a word. I repeated that order several times, and they refused to obey, and that is when I arrested them."

He testified that all the other arrests in the waiting rooms of the remaining depots were virtually identical.

The testimony with respect to the circumstances surrounding the arrests is equally explicit. Chief of Police Rayfield

was questioned on the existence of crowds of people around any of the terminals when a group of Riders arrived and were arrested. He testified that there were two such occasions, one on the first arrival at the Trailways terminal on May 24 when he was present, and another when the first group came to the Illinois Central terminal, of which he had a report. At the Trailways terminal, he testified that a number of people were waiting in cars and others congregated outside the terminal. To his knowledge none of them were fighting, loud or armed; their attitude, however, he termed hostile. The ones not in cars were asked to disperse, and they did. At the Illinois Central terminal, Rayfield had reports that 10 or 15 people were milling about in the street exhibiting a hostile and disturbed attitude. They were asked to move, they complied and were gone by the time the Riders arrived. He then testified:

> "Q. Did you receive any other reports from your police officers of this nature? A. That's the only two.

> "Q. The only two reports you know about?" A. The only two I received where there could have been any situation like you were just discussing. Now, the others I don't recall that there has been any other trouble around any of the terminals."

Captain Ray testified that the events within the terminal were roughly similar for all the arrests: Before the arrival of a group, people inside the terminal would make remarks, none of which particularly threatened violence. If necessary, he would order all those who did not have tickets or some business in the terminal to leave; they always complied. When the group arrived, some remarks were made, people in the terminal would follow them around, but no acts of violence ever took place. Captain Ray ventured the opinion that there might have been incidents of violence had he not arrested the Riders, but there is no indication that the situation could not have been handled by restraining or arresting the offending party.

This is the extent of the evidence in the record on potential breaches of the peace.

This action was brought by three Negro plaintiffs from the City of Jackson as a class action, on behalf of themselves and other Negroes similarly situated, under the Civil Rights Act, 42 U.S.C.A. § 1983, which creates an equitable cause of action against

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws * * *."

The jurisdiction of the three-judge court is invoked pursuant to 28 U.S.C. § 2281, § 2284 because the constitutionality of state statutes has been attacked. The statutes attacked are the so-called segregation statutes of the State of Mississippi which require racial segregation in all common carriers and in waiting room and rest room facilities used by the carriers, and provide criminal penalties for carriers and persons refusing to abide by these laws.[3]

The defendants attacked the jurisdiction of the three-judge court on the ground that these statutes have never been enforced and no arrests have been made under their provisions. Under the recent case of Poe v. Ullman, 1961, 367 U. S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989, the complete failure to enforce a state law, coupled with its open and notorious violation, prevents the federal courts from reaching the constitutionality of the statute since no case or controversy is presented. If such were the case here, the three-judge court would not have juris-

3. These statutes are: Title 11, Sections 2351, 2351.5, 2351.7, and Title 28, Sections 7784, 7785, 7786, 7786–01, 7787, 7787.5, Miss.Code Ann. (1942).

diction. The evidence shows, however, that the defendant carriers and the Jackson police maintain signs pursuant to the command of these statutes. This is sufficient evidence of enforcement to create a case or controversy and maintain the jurisdiction of the three-judge court.

In the alternative, the defendants argue that jurisdiction over the segregation statutes may not extend to the collateral problem of enforcement of segregation by means of the breach of the peace statutes on the grounds: (1) there is no authority under § 2284, and (2) the court may not consider issues of fact. The concept of federal jurisdiction is by no means this narrow. In Sterling v. Constantin, 1932, 287 U.S. 378, 53 S.Ct. 190, 193, 77 L.Ed. 375, the jurisdiction of the three-judge court, originally invoked to test a state statute limiting oil production, extended to the Governor of Oklahoma's attempt to institute the same production limitations by fiat under martial law. The three-judge court made extensive findings and concluded: "The evidence shows no insurrection nor riot; in fact, existing at any time in the territory, no closure of the courts, no failure of civil authorities." On this basis, the court held that the invocation of martial law was invalid and that the military orders enforcing the production limitations were a denial of due process. The Supreme Court upheld the district court and specifically approved the extensive findings of fact:

> "Accordingly, it has been decided in a great variety of circumstances that, when questions of law and fact are so intermingled as to make it necessary, in order to pass upon the federal question, the court may, and should, analyze the facts." (287 U.S. at p. 398, 53 S.Ct. at p. 195.)

The Court went on to say that the jurisdiction of the three-judge court

> " * * * extends to every question involved, whether of state or federal law, and enables the court to rest its judgment on the decision of such of the questions as in its opin-ion effectively dispose of the case." (287 U.S. at pp. 393–394, 53 S.Ct. at p. 193.)

See also, Hurn v. Oursler, 1933, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148; Florida Lime & Avacado Growers v. Jacobsen, 1960, 362 U.S. 73, 80 S.Ct. 568, 4 L.Ed.2d 568; Evers v. Dwyer, 1958, 358 U.S. 202, 79 S.Ct. 178, 3 L.Ed.2d 222.

The City of Jackson, its Mayor, Commissioners and Chief of Police urge that the City cannot be sued in this action. They rely upon Monroe v. Pape, 1961, 365 U.S. 167, 191 n. 50, 81 S.Ct. 473, 5 L. Ed.2d 492, and Egan v. City of Aurora, 1961, 365 U.S. 514, 81 S.Ct. 684, 5 L.Ed. 2d 741. The question is also relevant to relief against the Jackson Airport Authority.

The direct holding in Monroe v. Pape is that a municipal corporation is not a "person" within the meaning of Section 1983 for the purpose of holding it liable for damages, and is based upon the finding that Congress rejected an amendment which would have made such corporations liable for money damages in specific cases. 365 U.S. at 188, 81 S.Ct. 473. The defendants argue that if the City is not a "person" for purposes of damages, it cannot be a "person" for purposes of an injunction, and further argue that the Supreme Court specifically so held in footnote 50 of Monroe v. Pape, supra in 365 U.S. at p. 191, 81 S.Ct. at p. 486 when it said:

> "In a few cases in which equitable relief has been sought, a municipality has been named, along with city officials, as defendant where violations of 42 U.S.C. § 1983, 42 U.S.C.A. § 1983, were alleged. See, e. g., Douglas v. City of Jeannette, 319 U. S. 157 [63 S.Ct. 882, 87 L.Ed. 1324]; Holmes v. City of Atlanta, 350 U.S. 879 [76 S.Ct. 141, 100 L.Ed. 776]. The question dealt with in our opinion was not raised in those cases, either by the parties or by the Court. Since we hold that a municipal corporation is not a 'person' within the meaning of § 1983, no inference to

the contrary can any longer be drawn from those cases."

The question of whether a municipality could be sued under § 1983 for *equitable* relief, however, was not before the Court, and I do not believe that the Court intended in a footnote to overrule prior cases indicating that a municipal corporation could be so sued. See Douglas v. Jeannette, supra; Holmes v. City of Atlanta, supra; Mayor and City Council of Baltimore City v. Dawson, 350 U.S. 877, 76 S.Ct. 133, 100 L.Ed. 774, affirming 220 F.2d 386 (4 Cir., 1955). This is especially true when the legislative history upon which the Court relies is directed solely to the question of damages. We are not here concerned with the question of tortious action and the liability of the City taxpayers for such actions over which they had little possible control. The question here is one of prospective equitable relief for the protection of the plaintiffs' constitutional rights against not just the tortious activity of individuals, but the enforcement of City ordinances, officially declaring City policy, and officially recorded on the City Journal. This same issue has been before the Seventh Circuit Court of Appeals since Monroe v. Pape, and that Court held:

> "None of the reasons which support a city's immunity from an action for damages for tortious injuries already inflicted by its officers, agents or servants applies to this case. No reason is apparent why a city and its officials should not be restrained from prospectively violating plaintiffs' constitutional rights pursuant to its own legislative enactment, and an injunction not be granted as provided in § 1983."

Adams v. City of Park Ridge, 7 Cir., 1961, 293 F.2d 585, 587. For these reasons, I believe that footnote 50 in Monroe v. Pape may be construed to say that, whether or not a municipal corporation is subject to *equitable* relief under § 1983, no inference from cases indicating that it may is relevant to the issue of its liability for damages.

More fundamentally, however, the plaintiffs' right of action against the City does not depend alone upon § 1983. The rights asserted here are based on the Constitution which itself creates the cause of action for equitable relief and, within the meaning of 28 U.S.C. § 1343(3) (the jurisdictional provision upon which this suit is based), authorizes this suit. Cf. Bell v. Hood, 1946, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939; Brewer v. Hoxie School District No. 46, 8 Cir., 1956, 238 F.2d 91, 103; Hart & Wechsler, The Federal Courts And The Federal System 794–97 (1953). Doctrines of immunity can have no application to suits in equity brought to restrain invasions of federal constitutional rights. Sterling v. Constantin, 1932, 287 U.S. 378, 393, 53 S.Ct. 190, 77 L.Ed. 375; Ex parte Young, 1908, 209 U.S. 123, 155, 156, 28 S.Ct. 441, 52 L.Ed. 714; Graves v. Texas Company, 1936, 298 U.S. 393, 403–404, 56 S.Ct. 818, 80 L.Ed. 1236; Georgia R. R. & Banking Co. v. Redwine, 1952, 342 U.S. 299, 305 n. 17, 72 S.Ct. 321, 96 L.Ed. 335.

I would hold that the City of Jackson and the Jackson Airport Authority are proper parties.

All motions attacking this court's jurisdiction should be overruled.

Nor should this court abstain from considering the merits. The court may not rely on Harrison v. N. A. A. C. P., 1959, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152, which approves abstention where the state law attacked might be construed by the state courts to avoid the constitutional question, since the segregation statutes are incapable of a valid construction. No authority whatsoever may be found for the proposition, that, where a state statute is clearly and unavoidably unconstitutional on its face, comity requires that state courts be allowed the privilege of so declaring. Such a rule would be, not abstention, but abdication of our judicial function. Nor may this court rely on Douglas v. Jeannette, 1943, 319 U.S. 157, 63 S.Ct. 882, 87 L.Ed. 1324, which held that federal courts, as a matter of comity and equitable discretion,

should not interfere with state criminal proceedings and law enforcement officials when an adequate remedy is provided in the state proceedings for the protection and assertion of all constitutional rights. The primary requirement of Douglas v. Jeannette is that there be an adequate state remedy; that is not the case here. An exception to Jeannette has developed in favor of class actions on behalf of Negroes combating state supported segregation. As stated by the Court of Appeals in Morrison v. Davis, 5 Cir., 1958, 252 F.2d 102, 103:

"This is not such a case as requires the withholding of federal court action for reason of comity, since for the protection of civil rights of the kind asserted Congress has created a separate and distinct federal cause of action. 42 U.S.C.A. § 1983. Whatever may be the rule as to other threatened prosecutions, the Supreme Court in a case presenting an identical factual issue affirmed the judgment of the trial court in the Browder case [Browder v. Gayle, D.C.Ala., 142 F.Supp. 707, aff'd 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114] in which the same contention was advanced. To the extent that this is inconsistent with Douglas v. City of Jeannette, Pa., 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324, we must consider the earlier case modified."

 Actually, this is not so much an exception as a practical application of the Jeannette requirement of "adequacy." For the alternative to this suit is that a great number of individual Negroes would have to raise and protect their constitutional rights through the myriad procedure of local police courts, county courts and state appellate courts, with little prospect of relief before they reach the United States Supreme Court. That Court already has a heavy docket without numerous such cases. Moreover, the proof of segregation may not be a straightforward proposition. As in the case here, the true nature of state policy and practice may become apparent only after proof of a

pattern and practice over an extended period of time. Such a record can only be prepared in a single suit which finally settles the issue once and for all. The some 300 citizens arrested in Jackson since May cannot be expected to provide at their trials a record similar to the one in this case; and yet, without it, there may be no way for them to assert and protect their constitutional rights. All these factors go to the "adequacy" of the breach of the peace criminal proceedings and weigh against it. Equally important under the cricumstances of this case is that, for some of the reasons above, Negro citizens in Mississippi will not even attempt to exercise their constitutional rights because their state remedies possibly "adequate in theory" are wholly inadequate in practice.

Another factor bearing on the adequacy of the state criminal proceedings is that the Freedom Riders arrested in this case were travelers in interstate commerce. For such travelers to be delayed by arrest and trial, to be required to return for a de novo county court trial, and perhaps again for an appeal, is an unreasonable burden on interstate commerce when their only crime is the assertion of undisputed statutory and constitutional rights. This burden makes the state criminal proceedings wholly inadequate as an alternative to the present suit.

Any further doubts as to the validity of the distinction drawn in Morrison v. Davis, or the refutation of Douglas v. Jeannette, are put to rest by considering the bearing of the Fourteenth Amendment and 42 U.S.C.A. § 1983 on the duty of this court. The Supreme Court had an opportunity to pass on the basic thrust and purpose of the Fourteenth Amendment soon after it was adopted. In the Slaughter-House Cases, 1872, 16 Wall. 36, 83 U.S. 36, 71–72, 21 L.Ed. 394, the Court said:

"We repeat, then, in the light of this recapitulation of events, almost too recent to be called history, but which are familiar to us all; and on

the most casual examination of the language of these amendments, no one can fail to be impressed with the one pervading purpose found in them all, lying at the foundation of each, and without which none of them would have been even suggested; we mean the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over him. It is true that only the fifteenth amendment, in terms, mentions the negro by speaking of his color and his slavery. But it is just as true that each of the other articles was addressed to the grievances of that race, and designed to remedy them as the fifteenth.

"We do not say that no one else but the negro can share in this protection * * *. But what we do say, and what we wish to be understood is, that in any fair and just construction of any section or phrase of these amendments, it is necessary to look to the purpose which we have said was the pervading spirit of them all, the evil which they were designed to remedy * * *."

The last section of the Fourteenth Amendment provides that "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." Such legislation was already on the books when the Slaughter-House Cases were decided, and the very section under which the plaintiffs have brought this suit, 42 U.S.C.A. § 1983, may be traced to section 1979 of the Revised Statutes and section 1 of the Ku Klux Act of April 20, 1871, 17 Stat. 13. This section was recently before the Supreme Court in Monroe v. Pape, supra, where the Court discussed in detail its legislative history and purposes. As with the Fourteenth Amendment, this section was passed by Congress to secure the newly-won freedom of the Negro population in the South; it was intended to deal more specifically, however, with the securing of these rights in an atmosphere of violence caused by the unleashing of passions and prejudices which the mere assertion of these rights engendered in a portion of the white population. The Congressional solution was to create a remedy through the federal courts. The Court states:

"The debates were long and extensive. It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies." (365 U.S. at 180, 81 S.Ct. at 480)

Mr. Justice Frankfurter adds to this in his separate opinion what might be called the substantive right to the exercise of federal jurisdiction:

" * * * the theory that the Reconstruction Congress could not have meant § 1979 principally as a 'jurisdictional' provision granting access to an original federal forum in lieu of the slower, more costly, more hazardous route of federal appeal from fact-finding state courts, forgets how important providing a federal trial court was among the several purposes of the Ku Klux Act. * * * Section 1979 does create a 'substantive' right to relief. But this does not negative the fact that a powerful impulse behind the creation of this 'substantive' right was the purpose that it be available in, and be shaped through, original federal tribunals." (365 U.S. at 251–252, 81 S.Ct. at 518.)

Not only is it apparent that the purpose of these provisions is to protect the very kind of rights the plaintiffs assert, but

the legislative history of section 1983 makes clear that the greater the danger of violence, the more important it is that the federal courts should accept and exercise jurisdiction. Thus, the major portion of the defense of the City of Jackson and of the Attorney General of Mississippi, attempting to justify their actions because of the danger of violence, actually provides the most powerful argument for this court to exercise its jurisdiction and grant a federal remedy to protect the plaintiffs' rights.

The majority takes the position that the major issue in this case is the questionable use of the breach of the peace statutes, and that under the Harrison case we should abstain to allow the state courts to construe them. The plaintiffs' attack, however, is upon the segregation statutes, not the breach of the peace statutes, and they allege that the State is practicing the simplest of all evasions— it makes arrests under the breach of the peace statutes for violations of the segregation statutes. If there is substance to this allegation, it would be a fraud upon the jurisdiction of this court to abstain and give recognition to such an evasion. When the constitutionality of a state statute is attacked, we are under a duty to inquire into the law as it is actually applied. In Poe v. Ullman,

supra, such an inquiry demonstrated that there was no case or controversy. In an earlier case, Nashville, C. & St. L. Ry. Co. v. Browning, 1940, 310 U.S. 362, 60 S.Ct. 968, 84 L.Ed. 1254, such an inquiry uncovered a valid administrative amendment to a tax-assessing statute and the alleged discrimination was found to be a valid distinction.[4] In Sterling v. Consantin, supra, the inquiry uncovered the evasion of the Governor of Oklahoma. As a later Supreme Court case interpreted Sterling v. Constantin,

"There martial law was employed in support of an order of the Texas Railroad Commission limiting production of oil in the East Texas field. The Governor was sought to be restrained as part of the main objective to enjoin 'the execution of an order made by an administrative * * * commission,' and as such was indubitably within § 266 [now § 2284]."[5]

In this case, under the facts shown after a full trial and the law applicable to these facts, I am unable to find a bona fide breach of the peace issue. Rather, the facts clearly show that the arrests are a simple evasion to enforce segregation. This evasion provides no ground for abstention.[6]

4. "Here, according to petitioner's own claim, all the organs of the state are conforming to a practice, systematic, unbroken for more than forty years, and now question for the first time. It would be a narrow conception of jurisprudence to confine the notion of 'laws' to what is found written on the statute books, and to disregard the gloss which life has written upon it. Settled state practice cannot supplant constitutional guarantees, but it can establish what is state law. The equal protection clause did not write an empty formalism into the Constitution. Deeply embedded traditional ways of carrying out state policy, such as those of which petitioner complains, are often tougher and truer law than the dead words of the written text." Nashville, C. & St. L. Ry. Co. v. Browning, 1940, 310 U.S. 362, 369, 60 S.Ct. 968, 972.

5. Phillips v. United States, 1941, 312 U.S. 246, 253, 61 S.Ct. 480, 484, 85 L.Ed. 800.

6. See also Evers v. Dwyer, 1958, 358 U.S. 202, 79 S.Ct. 178, 179, 3 L.Ed.2d 222, where the Court ordered a three-judge court, whose jurisdiction was invoked to enjoin Tennessee transportation statutes requiring segregation, to hear that and "any other method of state-enforced segregation on Memphis transportation facilities."

The Court has continually struck down state-enforced schemes of segregation, whether they were done directly or "ingeniously or ingenuously." Cooper v. Aaron, 1958, 358 U.S. 1, 17, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5; Smith v. Texas, 1940, 311 U.S. 128, 132, 61 S.Ct. 164, 85 L.Ed. 84; Lane v. Wilson, 1939, 307 U.S. 268, 275, 59 S.Ct. 872, 83 L.Ed. 1281; see Bush v. Orleans Parish School

The statutes and ordinances which on their face require the segregation of the races in any transportation facility should be declared unconstitutional, null, and void. Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; Browder v. Gayle, M.D.Ala., 142 F. Supp. 707, aff'd 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114 (1954); Baldwin v. Morgan, 5 Cir., 1958, 251 F.2d 780; Boman v. Birmingham Transit Co., 5 Cir., 1960, 280 F.2d 531.

It should be declared impermissible to use laws which purport to deal with the maintenance of law and order, or any other laws, to maintain segregation of the races in any transportation facility. To that end, it should be declared that no passenger or intended passenger is subject to arrest for disorderly conduct or breach of the peace unless the passenger is himself disorderly or does something more than to occupy some facility or place intended for use by persons of another race and to refuse to remove himself from such place or facility. To arrest a passenger under such circumstances is state-enforced segregation and therefore unconstitutional.

The defendants argue strongly on this last point that the State has merely been asserting its rights under the police power to maintain law and order. The evidence clearly shows, however, that none of the passengers arrested was ever himself disorderly. This poses the question of whether a passenger, whose only crime is the exercise of an undisputed constitutional right, may be arrested because this exercise provokes others to threaten or actually commit disorderly acts. That this is the substance of the defendants' position is clearly inferred from the facts to which they themselves testified—the signs on the sidewalk outside the waiting rooms pursuant to the segregation ordinance, the arrest of all those who attempted to "crack the laws"

of Mississippi (to use the words of the State Attorney General), and the complete lack of disorderly conduct on the passenger's part at the time of arrest. This inference is made explicit, however, by the testimony of the Mayor, who states that, by definition, anyone who attempts to test the "separation of the races" creates a breach of the peace and provokes disorder.

This issue must be met head on for the evidence shows that on at least two occasions there was a danger of riots and disorder. Although past disorder does not concern us as far as a prospective injunction is concerned, there is a strong possibility that a similar situation would arise after an injunction did go into effect.

The issue is decided by again returning to the basis of this suit, the Fourteenth Amendment and section 1983. The Amendment was adopted and this section passed soon after the completion of the Civil War. A glance at the legislative history of section 1983, cited in Monroe v. Pape, supra, demonstrates that Congress had before it extensive evidence of the violence caused in the South by the newly-won Negro rights. Yet, nowhere, either in the Amendment or in section 1983, can there be found an intimation that either the danger or the existence of such violence is grounds for the revocation of constitutional rights granted primarily to Negroes. Rather, the answer of Congress was to provide federal jurisdiction and a federal remedy for their protection. From this it can only be concluded that the provocation of violence in others is no defense to the denial of these plaintiffs' constitutional rights. If it were, the defendants and this court know that this case would spell the postponement of full enjoyment of constitutional rights by Negroes in the Deep South for many years to come. The Supreme Court faced and decided this is-

---

Board, E.D.La., 194 F.Supp. 182, aff'd sub nom. Gremillion v. United States, 1961, 82 S.Ct. 119. It is not uncommon for the states to attempt to enforce segregation through general police power

statutes. Boynton v. Virginia, 1960, 364 U.S. 454, 81 S.Ct. 182, 5 L.Ed.2d 206 (trespass); Boman v. Birmingham Transit Co., 5 Cir., 1960, 280 F.2d 531 (breach of the peace).

sue in Cooper v. Aaron, 1958, 358 U.S. 1, 16, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5, when it said:

"The constitutional rights of respondents are not to be sacrificed or yielded to the violence and disorder which have followed upon the actions of the Governor and Legislature. As this Court said some 41 years ago in a unanimous opinion in a case involving another aspect of racial segregation: 'It is urged that this proposed segregation will promote the public peace by preventing race conflicts. Desirable as this is, and important as is the preservation of the public peace, this aim cannot be accomplished by laws or ordinances which deny rights created or protected by the federal Constitution.' Buchanan v. Warley, 245 U.S. 60, 81 [38 S.Ct. 16, 62 L.Ed. 149]. Thus law and order are not here to be preserved by depriving the Negro children of their constitutional rights."

See also, Sterling v. Constantin, 1932, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375; Sellers v. Johnson, 8 Cir., 1947, 163 F.2d 877; Rockwell v. Morris, 1961, 12 A.D. 2d 272, 211 N.Y.S.2d 25.

A police officer would be justified in requiring a person to move from a transportation facility because of a sudden, unexpected, and extreme danger of bloodshed which could not be otherwise avoided. There is no evidence in this record, however, of such a situation having arisen. In the case of the incidents on the Jackson City Lines buses, there is not even the intimation of potential disorder. Except for the two Freedom Rider arrivals where crowds gathered outside the transportation terminals, there is no evidence of an actual breach of the peace or a potential which a minimum of police officers could not have readily handled by arresting the individual actually creating the disorder. In the case where the crowd surrounded the Illinois Central, it was easily dispersed before the Riders even arrived, putting it in the same situation as all the others. On May 24, the day of the first Rider

group, although the crowd was sizable, and their attitude hostile, they never created an actual disturbance or reached proportions beyond the ability of the police to handle, even had the Riders been allowed to remain in the terminal. It should, at this point, be noted that the Mayor of Jackson had been notified by the Attorney General of the United States before the Riders' arrival that, if, in the Mayor's opinion, the situation could not be handled by local authorities, he stood ready to send in Federal Marshals to aid the enforcement of order as had been done in Montgomery, Alabama. And I think it can be said with assurance that, if at any future time the law enforcement officials of Mississippi find that they cannot themselves handle the provocation of violence caused by the Negroes' exercise of their constitutional rights, the Attorney General of the United States would stand ready to send in Federal Marshals or any stronger force necessary to enforce order. There is no necessity to forego the exercise of rights guaranteed by the Constitution and laws of the United States in order to prevent violence on the part of persons opposed to the exercise of such rights. Any such surrender to mob rule would tremendously encourage mob spirit. We must continue to be ruled not by the mob, but by the Constitution and laws of our Country.

It is my opinion that a permanent injunction should issue against the City of Jackson, its Mayor, Commissioners and Chief of Police, and the Jackson Municipal Airport Authority to restrain them from acting contrary to the foregoing declarations and to protect to the best of their ability the right of any passenger or intended passenger to exercise his constitutional rights on public transportation facilities.

This permanent injunction should extend to the State Attorney General. While he is not responsible for the enforcement of State laws through the local courts, and has prosecuted none of the arrests found in the record, he partook in meetings both before and after the arrival of the Freedom Riders on May

24, which determined the manner in which the situation would be, and thereafter was, handled. As the State official primarily charged with the duty to enforce State law, he must be held responsible for the plans made at these meetings and the way in which they have been carried out.

A permanent injunction should issue against Cicero Carr requiring him to serve without discrimination at the Airport Restaurant all members of the public who use and frequent the Jackson Municipal Airport and request service.

The carriers, Continental Southern Lines, Inc., Southern Greyhound Lines, Illinois Central Railroad, Inc., and Jackson City Lines, Inc., have stated that they are acting under apparent compulsion of City ordinance or State statute in any maintenance of segregation of the races in their transportation facilities of which they may be guilty; and, that, promptly upon this court's declaration that such statutes and ordinances are unconstitutional, they will remove all signs indicating that any place or facility is intended for the use of persons of any particular race and will not further enforce or have any part in enforcing segregation of the races in any transportation facility. A simple declaratory judgment is therefore all that seems necessary as to said carrier defendants. This court should retain jurisdiction, however, so that further orders and judgments could be entered if it should thereafter be necessary or advisable.

In their prayer for relief, the plaintiffs ask that the enforcement of the segregation statutes and any other statutes used to enforce segregation be enjoined. They include in this prayer not only the restraining of future enforcement, but also the continued enforcement of these statutes against all of those arrested after the filing of this suit. According to the evidence, this includes some 190 persons. The power of the court to grant this request is supported fully by law. In Ex parte Young, 1908, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, the Supreme Court reaffirmed the principle that a court of equity could enjoin criminal proceedings commenced after the filing of a suit in federal court to enforce the same right. The Court stated:

"It is further objected * * * that a court of equity has no jurisdiction to enjoin criminal proceedings, by indictment or otherwise, under the state law. This, as a general rule, is true. But there are exceptions. When such indictment or proceeding is brought to enforce an alleged unconstitutional statute, which is the subject-matter of inquiry in a suit already pending in a Federal court, the latter court having first obtained jurisdiction over the subject-matter, has the right, in both civil and criminal cases, to hold and maintain such jurisdiction, to the exclusion of all other courts, until its duty is fully performed. * * * Where one commences a criminal proceeding who is already party to a suit then pending in a court of equity, if the criminal proceedings are brought to enforce the same right that is in issue before that court, the latter may enjoin such criminal proceedings."

209 U.S. at 161–162, 28 S.Ct. at 454. See also, In re Sawyer, 1888, 124 U.S. 200, 211, 8 S.Ct. 482, 31 L.Ed. 402; Truax v. Raich, 1915, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131, aff'g 219 F. 273 (D.Ariz., 1915). In terms of the anti-injunction statute, 28 U.S.C. § 2283, it is a power "in aid of its jurisdiction" to prevent state courts from interfering with the determination of issues properly before the federal court. The propriety of granting such a request, however, is discretionary, and only the strongest equities will support such outright interference with state proceedings already commenced. I am of the opinion that such equities exist in this case.

The plaintiffs have had a motion for preliminary injunction pending since the filing of the original complaint on June

9, 1961. Although the plaintiffs filed an amended complaint on July 17 to make more explicit their attack upon the breach of peace arrests, the original complaint is broadly enough framed to include them. When a motion for preliminary injunction has been made, a three-judge court is directed by statute to give an expeditious hearing and decision. 28 U.S.C. § 2284(4) provides, "the application shall be given precedence and assigned for hearing at the earliest practicable day." 28 U.S.C. § 1253 provides that the granting or denial of this motion may be appealed directly to the Supreme Court; the appeal lies as a matter of right. R. C. A. v. United States, N.D.Ill., 1950, 95 F.Supp. 660, aff'd, 341 U.S. 412, 71 S.Ct. 806, 95 L.Ed. 1062 (1951). Thus, not only were the plaintiffs entitled to an early hearing and decision, but, in my opinion, they were entitled to a preliminary injunction. As Mr. Justice Brandeis wrote in Union Tool Co. v. Wilson, 1922, 259 U.S. 107, 112, 42 S.Ct. 427, 429, 66 L.Ed. 848: "Legal discretion * * * does not extend to a refusal to apply well-settled principles of law to a conceded state of facts." The essential facts in this case are undisputed, the law to be applied is clear, irreparable injury is established by evidence of a clear and continued deprivation of constitutional rights. The defendants' argument that such an injunction would have changed the status quo and therefore should not have been granted was before the Fourth Circuit Court of Appeals in a very similar case involving segregation of transportation facilities, and was decided adversely to the defendants. Henry v. Greenville Airport Commission, 4 Cir., 1960, 284 F.2d 631. The defendants should not be allowed to rely upon their own continued unconstitutional behavior for the purposes of defeating a motion for preliminary injunction. I would follow the ruling in the Henry case. See also Clemons v. Board of Education, 6 Cir., 1956, 228 F.2d 853, 857; Board of Supervisors v. Wilson, 340 U.S. 909, 71 S.Ct. 294, 95 L.Ed. 657, affirming 92 F. Supp. 986 (E.D.La., 1950) (preliminary injunction granting admission to L.S.U.). Had such an injunction issued, arrests and prosecution of those arrested would have been terminated, starting at the very latest with the date of the first hearing, July 10, 1961.

The continued refusal to rule on this motion, although it has been pending since the 9th of June, is in violation of this court's duty under the law, and the refusal should therefore be construed as a de facto denial. The reason for continuing the first hearing until August 8, 1961, due to the sickness of an Assistant Mississippi Attorney General, may have been warranted with respect to relief against his superior, but the City was present and, as subsequent events have shown, it was both willing and able to carry on a vigorous defense in its own behalf.

Thus, because of the undisputed facts, the clear violation of the plaintiffs' rights, and the unreasonable delay in ruling on the preliminary injunction, all prosecutions of passengers or intended passengers who were arrested for breach of the peace after the filing of the original complaint on June 9, 1961, but who, as the evidence in this case shows, were not themselves disorderly, should be enjoined.

Since this dissenting opinion was written, I have had the opportunity to read the memorandum opinion of Judge Frank M. Johnson, Jr., in Lewis et al. v. The Greyhound Corporation et al., M.D.Ala., 199 F.Supp. 210, and find myself in agreement with nearly all of the views expressed by Judge Johnson in that opinion.

I respectfully dissent.